UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

| | | |
|---|---|---|
| PURE FISHING, INC., an Iowa Corporation, | ) ) ) | Civil File No. 3:10-cv-2140-CMC |
| Plaintiff, | ) ) | **AMENDED ANSWER AND COUNTERCLAIM** |
| v. | ) ) | (Jury Trial Demanded) |
| NORMARK CORPORATION, a Minnesota Corporation, d/b/a RAPALA, | ) ) ) | |
| Defendant. | ) ) ) ) | |

Defendant and Counterclaim-Plaintiff, Normark Corporation ("Normark"), submits its

Amended Answer and Counterclaim.

**AMENDED ANSWER**

For its Amended Answer to the corresponding numbered paragraphs of the First

Amended Complaint ("Amended Complaint"), Normark admits, denies and alleges as follows.

Unless expressly admitted or qualified herein, each and every allegation of the Amended

Complaint is denied.

**FIRST DEFENSE**

1.      Normark lacks information sufficient to form a belief as to the truth of the

allegations contained in Paragraph 1 of the Amended Complaint and therefore denies them.

2.      In response to the allegations contained in Paragraph 2 of the Amended

Complaint, Normark admits only that it is a Minnesota corporation with its principal place of

business at 10395 Yellow Circle Drive, Minnetonka, Minnesota 55343, and is a subsidiary of

Rapala VMC Corporation.

3.      Normark admits that this is an action alleging patent infringement under the patent laws of the United States.

4.      Admitted.

5.      Normark admits that it is subject to personal jurisdiction in this District, denies that it committed acts of infringement in this District or anywhere else, and denies the remaining allegations contained in Paragraph 5 of the Amended Complaint.

6.      Admitted.

7.      Normark admits that a purported copy of U.S. Patent No. 5,749,214 ("the '214 Patent") is attached as Exhibit A to the Amended Complaint, and that the issue date stated on Exhibit A to the Amended Complaint is May 12, 1998, that the claims are, in general, directed to manufacturing processes, and further avers that the claims of the '214 Patent speak for themselves.  Normark lacks information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 7 of the Amended Complaint and therefore denies them.

8.      Normark admits only that it offers and sells Sufix brand fishing line in the United States, and that some Sufix brand fishing lines compete with fishing lines sold by Plaintiff, and denies the remaining allegations contained in Paragraph 8 of the Amended Complaint.

9.      Denied.

10.      Normark admits that a purported copy of U.S. Patent No. 6,174,525 ("the '525 Patent") is attached as Exhibit B to the Amended Complaint, that the issue date stated on Exhibit B to the Amended Complaint is January 16, 2001, and that the clams are, in general, directed to fishing lures and further avers that the claims of the '525 Patent speak for themselves.  Normark

lacks information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 10 of the Amended Complaint and therefore denies them.

11.     Normark admits that it offers and sells Trigger X brand fishing lures in the United States and that some such lures compete with lures sold by Plaintiff.  Normark admits that it learned of the '525 Patent by July 2006, and may have learned of it earlier than July 2006. Normark denies the remaining allegations contained in Paragraph 11 of the Amended Complaint.

12.     Denied.

13.     Denied.

14.     Denied.

15.     Denied.

16.     Denied.

17.     Denied.

18.     Denied.

19.     Denied.

## SECOND DEFENSE

20.     Normark has not infringed the '214 Patent.

## THIRD DEFENSE

21.     The asserted claims of the '214 Patent are invalid because they do not meet the conditions for patentability set forth in 35 U.S.C. §§ 101, 102, 103, and/or 112.

## FOURTH DEFENSE

22.     Normark has not infringed the '525 Patent.

## FIFTH DEFENSE

23.     The asserted claims of the '525 Patent are invalid because they do not meet the conditions for patentability set forth in 35 U.S.C. §§ 101, 102, 103 and/or 112.

## SIXTH DEFENSE

24.     The '214 Patent is unenforceable due to inequitable conduct, as described in

Normark's Counterclaim, which is incorporated by reference as though fully set forth herein.

## SEVENTH DEFENSE

25.     Plaintiff's claims are barred, in whole or in part, by the doctrine of laches.

## AMENDED COUNTERCLAIM

1.     For its amended counterclaims against Pure Fishing, Defendant and

Counterclaim-Plaintiff Normark Corporation ("Normark"), alleges as follows.  Normark seeks to

obtain a declaratory judgment that the '214 Patent is unenforceable.

2.     Pure Fishing is, on information and belief, an Iowa corporation with a principal

place of business at 7 Science Court, Columbia, South Carolina.  Pure Fishing filed this action in

this District and Division, thereby availing itself of the jurisdiction of this Court.

3.     Normark is a Minnesota corporation with a principal place of business in

Minnetonka, Minnesota.

4.     This action arises under the Declaratory Judgment Act, 28 U.S.C. § 2201, *et seq.*,

and under the patent laws of the United States, 35 U.S.C. § 1, *et seq.*

5.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331,

1338(a), 2201, and 2202.

6.     Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(b)-(c).

7.     Pure Fishing purports to own the '214 Patent, and has filed suit against Normark

alleging infringement of the '214 Patent.

8.     An immediate, real, and justiciable controversy exists between Pure Fishing and

Normark as to whether the '214 Patent enforceable.

## COUNT I
## DECLARATION OF UNENFORCEABILITY

9.     Normark repeats and incorporates the previous allegations of its Counterclaims

herein as if repeated verbatim.

10.     The '214 Patent is unenforceable due to inequitable conduct by Berkley, Inc.,

Pure Fishing's predecessor in interest, and/or its agents and/or attorneys during the prosecution

of the '214 Patent before the United States Patent and Trademark Office ("Patent Office").

Specifically, Patentee made material false statements to the Patent Office and knew of but failed

to disclose material, non-cumulative prior art references to the Patent Office, all with specific

intent to deceive.  The '214 Patent would not have issued but for these material

misrepresentations and omissions.

11.     On or about October 4, 1996, Pure Fishing's predecessor in interest, Berkley, Inc.,

filed U.S. Patent Application No. 08/725,995 ("the '995 application"), which later issued as the

'214 Patent.

12.     The '995 application named Roger B. Cook ("Cook") as the purported sole

inventor and included 20 claims, including 2 independent claims.  The application was

prosecuted by Lance G. Johnson, USPTO Registration No. 32,531 of the firm of Banner &

Witcoff, with an address of Suite 100, 1001 G Street, N.W., Washington, D.C. 20001

("Johnson").  The file history of the '214 Patent is attached hereto as EXHIBIT A and is

incorporated by reference herein.

13.     Berkley, Inc., Cook, and Johnson shall hereinafter be collectively referred to as

the "Patentee."

## MATERIAL FALSE STATEMENTS TO THE USPTO

14.    Original claim 1 of the '995 application reads as follows:

> A process for making twisted or braided lines of gel spun polyolefins, said process comprising stretching a braided or twisted line of gel spun polyolefin yarns at a temperature within the range from about 130° C to about 150° C and at a total draw ratio within the range from about 1% to about 100%.

15.    Original claim 10 of the '995 application reads as follows:

> A process for making twisted or braided lines of gel spun polyolefins, said process comprising stretching a braided line of gel spun polyolefin under conditions sufficient to increase the tenacity of the stretched line by at least 10% relative to the unstretched line.

16.    During prosecution of the '995 application, the Examiner at the Patent Office issued an Office Action on or about April 28, 1997 ("the Office Action") in which all claims were rejected under 35 U.S.C. § 102(b) as anticipated by U.S. Patent No. 5,176,862 to Hogenboom et al. ("Hogenboom"), a copy of which is attached hereto as EXHIBIT B and incorporated herein.

17.    In a response to the Office Action ("the Response to the Office Action"), which was filed on about September 29, 1997 and signed by Johnson, claim 1 was amended as follows:

> A process for ~~making~~ increasing tenacity in a twisted or braided ~~lines~~ fishing line made of gel spun ~~polyolefins~~ polyolefin yarns, said process comprising stretching a braided or twisted line of ~~gel spun polyolefin yarns~~ 3-64 gel spun polyolefin yarns, wherein each yarn is within the range from about 20 denier to about 1000 denier, at a temperature within the range from about ~~130~~ 110° C to about 150° C and at a total draw ratio within the range from about ~~1% to about 100%~~ 1.0 to about 2.0.

18.    Claim 10 was amended as follows:

> A ~~process for making twisted or~~ braided ~~lines of gel spun polyolefins~~ fishing line made from gel spun polyolefin yarns made by a ~~said~~ process comprising stretching a braided line of ~~gel spun polyolefin~~ 3-64 gel spun polyolefin filament yarns wherein each

yarn is within the range from about 20 denier to about 1000 denier ~~under conditions sufficient to increase the tenacity of the stretched line by at least 10% relative to the unstretched line.~~ under tension at a temperature within the range from about 110° C to about 150° C and at a total draw ratio within the range from about 1.0 to about 1.4.

19.    Independent claim 10 became independent claim 16 in the issued '214 Patent.

20.    The remainder of the claims that included the draw ratio expressed as a percentage were amended to express the draw ratio as a ratio, e.g., "about 1% to about 100%" was amended to read "about 1.0 to about 2.0."

21.    In the Response to the Office Action, filed on or about September 29, 1997, the Patentee also added 31 new claims, including independent claims 29 and 47.

22.    The independent claims and dependent claims included a limitation directed to the draw ratio expressed as a ratio and not a percentage.

23.    Claims 29 and 47 issued in the '214 Patent as claims 27 and 38, respectively.

24.    In the Response to the Office Action, filed on or about September 29, 1997, the Patentee made the following false material factual statements to the Examiner for the purpose of misleading the Examiner to allow the claims:

> Hogenboom et al. is directed with only general teachings to the stretching of ropes in order to increase the stiffness and tenacity of the rope. Indeed, there is little or no guidance provided in the specification outside the examples. The examples show a structure of 7x19x2x1600d (total of 425,600 denier) for ropes 1 and 3, and for rope 2 of 7x19x2x2000d (532,000 denier final). These ropes are stretched at either 120º C or 140º C to a total elongation of either 5 % or 23 %. There is no description of the draw ratios that were used to produce these results nor any correlation between elongation and draw ratio. No secondary reference has been cited to provide such information.
>
> The present invention is not, of course, a rope nor a process for making a rope. The product of the present process is a fishing line with a much smaller total denier than a rope and involves significantly different performance requirements. Ropes are not

7

measured for limpness, knot tying ability, and castability. Break strengths of fishing line is in pounds, usually 100 lbs or less for this material. Ropes are expected to withstand much higher loads before breaking. Thus, there is no anticipation and no enablement of the claimed invention from Hogenboom et al.

There is also no support for a rejection based on obviousness. Hogenboom says nothing about fishing lines, draws no correlations between rope manufacture and fishing line production, and does not provide an enabling disclosure to teach any relationship among the processing parameters of draw ratio, temperature, and number of draw stations. Hogenboom also does not teach or suggest a process that adds coloring agents with mineral oil or ethylene-acrylic acid copolymer, uses a relaxation/no draw heating step after the initial stretching station(s), or the effects on fishing lines of subjecting braided or twisted lines to a temperature within 110°-115° C and a total draw ratio of 1.05-1.3. No reference has been cited to bridge the gap between these two technologies to make a prima facie case of obviousness.

25.    During the prosecution of the '995 application and on or about September 29, 1997, in arguing that the claims were not anticipated by Hogenboom, the Patentee falsely stated to the Examiner that "There is no description of the draw ratios that were used to produce these results nor any correlation between elongation and draw ratio."

26.    This was an affirmative misrepresentation of a material fact.

27.    This affirmative misrepresentation was made by Johnson and the Patentee.

28.    The Patentee was associated with the filing and prosecution of the '995 application and as such owed the Patent Office a duty of candor and good faith in dealing with the Patent Office.

29.    This affirmative misrepresentation was made by the Patentee with a specific intent to deceive the Examiner into allowing the claims to issue.

30.    There is a direct mathematical relationship between elongation percentage and draw ratio, and at the time of filing of the application resulting in the '214 Patent, that relationship would have been known by someone of ordinary skill in the art.

31.    The Patentee knew of the mathematical relationship between elongation percentage and draw ratio.

32.    The original claims drafted by Johnson and the Patentee erroneously expressed the draw ratio in terms of a percentage – "about 1% to about 100%," which is actually the elongation percentage, not the draw ratio.

33.    In the Response to the Office Action filed on or about September 29, 1997, the Patentee stated in the Remarks section that "The claims have been amended to use the draw ratio expression of the examples (1.XX-1.YY) rather than a percentage to help avoid confusion between an elongation percentage and the claimed draw ratio."

34.    The claims were then amended by the Patentee to recite a ratio – "about 1.0 to about 2.0."

35.    The claim amendments and factual statements made by the Patentee show that Patentee knew there is a direct correlation between draw ratio and elongation percentage, that Patentee withheld this material information from the Examiner, and instead falsely represented to the Examiner that there was no such direct correlation.

36.    The Patentee's knowledge of the relationship between draw ratio and elongation percentage is recited explicitly in the '214 Patent.  Column 2, line 66 to column 3, line 5 states "Such stretching is performed at a total draw ratio within the range from about 1-100% (i.e., draw ratio of 1.0-2.0), preferably within the range from about 5-50% (draw ratio of 1.05-1.5), more preferably within the range from about 10-40% (draw ratio of 1.1-1.4), and particularly within the range from about 15-35% (draw ratio of 1.15-1.35)."  '214 Patent, 2:66-3:5.

37.    Therefore, the Patentee had specific knowledge of the relationship between draw ratio and percent elongation and falsely represented to the Examiner that no such relationship existed.

38.    Patentee then employed the foregoing misrepresentation of fact to support its further misrepresentation that Hogenboom contained no "description of the draw ratios," although Patentee knew that Hogenboom disclosed percent elongation and that percent elongation correlated directly to draw ratio and, therefore, knew that Hogenboom did contain a "description of the draw ratios."  At the same time, Patentee withheld from the Examiner that, contrary to Patentee's representation, Hogenboom did contain a description of draw ratios.

39.    The affirmative misrepresentation and the withheld information was material.

40.    In the Notice of Allowability dated December 22, 1997, the Examiner stated in the Examiner's statement of reasons for allowance: "Claims 1-6, 8-10, and 19-52 are allowable over the prior art of record because the prior art of record does not teach or suggest the entire combination of process steps set forth including. . . at a total draw ratio within the range from about 1.0 to about 2.0."

41.    Thus the Examiner relied upon the material omissions and misrepresentations of Johnson and the Patentee in allowing the claims.  The Examiner erred, *inter alia,* in failing to appreciate the direct mathematical correlation between percent elongation and draw ratio.

42.    The Patentee did not bring the material error on the Examiner's part to the attention of the Examiner.

43.    The '214 Patent thus would not have issued but for the affirmative material misrepresentations and omissions by the Patentee.

44. The above-described affirmative factual misrepresentations and withholding of material information were made by the Patentee with a specific intent to deceive the Examiner into allowing the claims to issue.

45. As further evidence of inequitable conduct, the Patentee falsely represented to the Examiner that Hogenboom was patentably distinct from the subject matter of the claims of the '214 patent application. Specifically, the Patentee falsely represented to the Examiner that Hogenboom was "directed with only general teachings to the stretching of ropes," that "there is little or no guidance provided in the specification outside the examples," and that "the present invention is not, of course, a rope nor a process for making a rope." The foregoing misrepresentation and the omission of the fact that Hogenboom had a much broader disclosure was material to gaining allowance of the claims.

46. This affirmative factual misrepresentation and withholding of material information were made by the Patentee with the specific intent to deceive the Examiner into allowing the claims to issue.

47. Hogenboom is not so limited as represented by Johnson and the Patentee in that Hogenboom expressly defines the term "rope" broadly. In column 1, lines 11-13, Hogenboom states "By 'rope' is understood in the present application: rope, cord, cable, string and similar structures comprising filaments or filaments and fibres." Thus the invention claimed in the '214 Patent is a "rope" as defined by Hogenboom.

48. The Patentee knew that the teachings of Hogenboom were not limited to any particular size of "rope," but instead defined "rope" broadly to include "string and similar structures comprising filaments and fibers."

49.     The Patentee made an affirmative material factual misrepresentation to the Examiner by arguing that Hogenboom was only directed to large denier rope even though they knew that the definition of rope included "string and similar structures comprising filaments or filaments and fibres." Further, a person of ordinary skill in the art would recognize that ropes, strings, fishing line, sutures, and fishing net all are representative of fiber applications and that the technology of heat stretching applied in general to fiber applications would apply the same to each of ropes, strings, fishing line, sutures, and fishing net.

50.     The Patentee omitted advising the Examiner that Hogenboom disclosed deniers smaller than rope including structures made of filaments and fibers like fishing lines.

51.     This affirmative factual misrepresentation and withholding of material information was made by the Patentee with the specific intent to deceive the Examiner into allowing the claims to issue.

52.     The foregoing omission and misrepresentation were material to gaining allowance of the claims.

53.     In the Notice of Allowability dated December 22, 1997, in the Examiner's statement of reasons for allowance, the Examiner stated "Claims 1-6, 8-10, and 19-52 are allowable over the prior art of record because the prior art of record does not teach or suggest the entire combination of process steps set forth including. . . the denier of each yarn being from about 20 to about 1000."

54.     In the Notice of Allowability dated December 22, 1997, in the Examiner's statement of reasons for allowance, the Examiner also stated "Hogenboom et al teach a rope comprising filament yarns with significantly higher deniers (e.g., 1600 and 2000) and significantly higher filaments (e.g., 7x19x2)."

55.     Thus the Examiner relied upon the material omissions and material factual misrepresentations of the Patentee in allowing the claims.

56.     The '214 Patent would not have issued but for any or all of the affirmative factual misrepresentations and omissions of the Patentee.

## FAILURE TO DISCLOSURE MATERIAL INFORMATION

57.     On or about April 27, 1995, Berkley, Inc. ("Berkley") filed U.S. Patent Application No. 08/428,485 (the " '485 Application"), which issued as U.S. Patent No. 5,540,990 (the "'990 Patent), a copy of which is attached hereto as EXHIBIT C and incorporated herein. Like the '995 Application, the '485 Application identified Cook as the sole inventor and the '485 Application was prosecuted by Johnson.

58.     On or about December 26, 1995, Berkley, Inc. filed U.S. Patent Application No. 08/585,250 (the " '250 Application"), which issued as U.S. Patent No. 6,148,597 (the "'597 Patent"), a copy of which is attached hereto as EXHIBIT D and incorporated herein. Like the '995 Application, the '250 Application identified Cook as the sole inventor and the '250 Application was prosecuted by Johnson.

59.     While the application that matured into the '214 Patent was pending, Patentee knew about and failed to disclose to the Patent Office in connection with the application that matured into the '214 Patent numerous material, non-cumulative prior art references.

60.     The inventions claimed in the '597 Patent, the '990 Patent, and the '214 Patent, all disclose similar technology that pertains to the stretching (including heat stretching) of braided or twisted lines made of high tenacity, ultrahigh molecular weight fibers. *See* '214 Patent, Column 1, Lines 4-6; '990 Patent, Column 1, Lines 5-7; '597 Patent, Column 1, Lines 9-11.

61.     Much of the text in the '214 Patent is a copy of text in the '990 and '597 Patents.

62.     For example, Column 1, Lines 8-29 of the '214 Patent is almost word for word the same as Column 1, Lines 11-32 of the '990 Patent and Column 1, Lines 13-25 of the '597 Patent.

63.     Column 2, Lines 35-55 of the '214 Patent is almost word for word the same as Column 5, Lines 14-34 of the '990 Patent and Column 5, Lines 13-30 of the '597 Patent.

64.     The Patentee knew of and disclosed numerous references during the prosecution of the '597 Patent and the '990 Patent that it did not disclose during the prosecution of the later filed '214 Patent, which was directed to the same general field of technology as the '597 Patent and the '990 Patent.  In fact, of the 41 references either cited by the Examiner or disclosed by the Patentee during prosecution of the '990 Patent, only three were disclosed by the Patentee to the Patent Office during prosecution of the '214 Patent.  Of the 55 references either cited by the Examiner or disclosed by the Patentee during prosecution of the '597 Patent, only three were disclosed by the Patentee during prosecution of the '214 Patent.  The Patentee selectively failed to disclose material prior art to the Patent Office in connection with the application that matured into the '214 Patent with specific intent to deceive the Patent Office into issuing the '214 Patent, and the '214 Patent would not have issued but for these material omissions.

65.     The non-cumulative, material prior art references that Patentee knew of but failed to disclose include, without limitation, the following references discussed in more detail below, all of which were known to the Patentee while the application resulting in the '214 Patent was pending:  Gibbs, "A New Twist for Line", *Outdoor Life* 192(5) (Nov. 1993); Berkley's own commercial prior art braided gel spun polyolefin braided fishing lines which were known, on sale or in public use in the United States; U.S. Patent No. 4,297,835; U.S. Patent No. 5,573,850; and U.S. Patent No. 5,601,775.

66.    Gibbs, "A New Twist for Line", *Outdoor Life* 192(5) (Nov. 1993) ("Gibbs").  A copy of Gibbs is attached hereto as EXHIBIT E and incorporated herein.  Gibbs is a printed article published in *Outdoor Life* magazine in November, 1993.  During the prosecution of the '990 Patent, Gibbs was submitted to the Patent Office by the Patentee in an Information Disclosure Statement ("IDS") received by the Patent Office on August 25, 1995.  Gibbs references some of Berkley's own commercial prior art braided gel spun polyolefin fishing lines which were known, on sale or in public use in the United States ("the Berkley prior art braided gel spun polyolefin fishing lines").

67.    During the prosecution of the '597 Patent, Gibbs was submitted to the Patent Office by the Patentee in an IDS received by the Patent Office on May 28, 1996.

68.    The '995 Application issued as the '214 Patent on May 12, 1998.  The Patentee was familiar with the Gibbs reference, knew it was material, and could have submitted it to the Patent Office in connection with the '995 Application, but did not do so.  Similarly, the Patentee was familiar with the Berkley prior art braided gel spun polyolefin fishing lines and could have disclosed them to the Patent Office in connection with the '995 Application, but did not do so.

69.    Gibbs discusses braided fishing line made of gel spun polyolefin yarns.  The Berkley prior art braided gel spun polyolefin fishing lines are commercial examples of such fishing lines.

70.    Gibbs references Berkley, Inc.'s sales of braided fishing line made of gel spun polyolefin yarns.

71.    The entirety of Gibbs is material to all of the claims of the '214 Patent.  The Berkley prior art braided gel spun polyolefin fishing lines are material to all of the claims of the '214 Patent for all the same reasons that Gibbs is material to them.

15

72.     Page 63, Column 1, Lines 10-17 of Gibbs recites "These are braided lines, not monofilament….  Others in the long line of new lines include the Spectra fiber line (gel-spun polyethylene)."

73.     During prosecution of the '995 Application, the Patentee argued "Hogenboom says nothing about fishing lines [and] draws no correlations between rope manufacture and fishing line production."

74.     The Patentee's statement in paragraph 73 above was made to the Examiner to impress upon him that although Hogenboom teaches the use of braided yarns made of gel spun polyolefins to make ropes, the use of braided yarns made of gel spun polyolefins to make fishing lines is completely new.

75.     At the time the Patentee's statement in paragraph 73 above was made, the Patentee knew that Gibbs taught that braided gel spun polyolefins can be used in many different applications, including both ropes and fishing lines.  At the time the Patentee's statement in paragraph 73 above was made, the Patentee knew that the Berkley prior art braided gel spun polyolefin fishing lines taught that braided gel spun polyolefins yarns can be used to make fishing lines.

76.     Gibbs recites "[Spectra has] been used for body armor, boat hulls, climbing rope, cable replacement, as hunting and archery bow string, and in military and aerospace applications."  Page 63, Column 2, Lines 21-25.

77.     To a person of ordinary skill in the art, Gibbs makes clear that use of braided Spectra is the same whether employed as fishing line, rope or in other fiber applications.

78.     Although Gibbs does not discuss the specific number of yarns in all of the braided fishing lines, a braid, by definition, includes at least 3 yarns or strands. Moreover, Gibbs discloses that an Izorline brand braided fishing line was made of 3 yarns or strands.

79.     Although Gibbs does not discuss the specific denier of the yarns, one of ordinary skill in the art, upon a reading of Gibbs, would understand that the deniers for fishing lines would include the range of 20-1000 denier that is recited in the claims of the '214 Patent.

80.     Gibbs discusses fishing line diameters and other parameters for fishing line. With these parameters, one of ordinary skill in the art can readily determine the denier for fishing line.

81.     Gibbs also discusses the increased strength of the new braided fishing lines when compared to traditional monofilament lines. See page 64, Column 2, Line 37 to page 65, Column 1, Line 18, which discuss fishing stories of the results of the stronger lines.

82.     The allegations of paragraph 81 above are material to the "increased tenacity" limitations of the claims of the '214 Patent.

83.     Gibbs, as is described in paragraphs 69 and 72 above, is material to the claim 1 limitation "A process for increasing tenacity in a twisted or braided fishing line made of gel spun polyolefin yarns."

84.     Gibbs, as is described in paragraphs 69 and 72 above, is material to the claim 16 limitation "A braided fishing line made from gel spun polyolefin yarns."

85.     Gibbs, as is described in paragraphs 69 and 72 above, is material to the claim 27 limitation "A twisted fishing line made from gel spun polyolefin yarns."

86.     Gibbs, as is described in paragraphs 69 and 72 above, is material to the claim 38 limitation "A process for making a fishing line made of gel spun polyolefin yarns."

87.    Gibbs, as is described in paragraphs 69 and 72 above, is material to the claim 1 limitation "stretching a braided or twisted line of 3-64 gel spun polyolefin yarns."

88.    Gibbs, as is described in paragraphs 69 and 72 above, is material to the claim 16 limitation "stretching a braided line of 3-64 gel spun polyolefin filament yarns."

89.    Gibbs, as is described in paragraphs 69 and 72 above, is material to the claim 27 limitation "stretching a twisted line of 3-64 gel spun polyolefin filament yarns."

90.    Gibbs, as is described in paragraphs 69 and 72 above, is material to the claim 38 limitation "stretching a braided or twisted line of gel spun polyolefin yarns."

91.    Gibbs, as is described in paragraphs 79 and 80 above, is material to the claim 1 limitation "wherein each yarn is within the range from about 20 denier to about 1000 denier."

92.    Gibbs, as is described in paragraphs 79 and 80 above, is material to the claim 16 limitation "wherein each yarn is within the range from about 20 denier to about 1000 denier."

93.    Gibbs, as is described in paragraphs 79 and 80 above, is material to the claim 27 limitation "wherein each yarn is within the range from about 20 denier to about 1000 denier."

94.    Gibbs, as is described in paragraphs 79 and 80 above, is material to the claim 38 limitation "wherein each yarn is within the range from about 20 denier to about 1000 denier."

95.    Gibbs is material to claims 2-15, 17-26, 28-37 and 39-43 of the '214 Patent as they all depend from one of claims 1, 16, 27 or 38.

96.    During prosecution of the '995 Application, the Patentee represented to the Patent Office that braided rope made of gel spun polyolefins had nothing to do with fishing line.

97.    The Patentee knew that braided fishing lines made of gel spun polyolefins already existed and that employing gel spun polyolefins in fishing line as opposed to rope was simply a matter of design choice and one that was foreseeable to a person of ordinary skill in the art: once

the producer decided it wanted to produce a rope, it would braid and heat stretch a thicker (more denier) bundle of yarn, whereas if it was fishing line, it would braid and heat stretch a thinner (less denier) bundle of yarn.

98.     If Gibbs or the Berkley prior art braided gel spun polyolefin fishing had been submitted to the Patent Office, while the '995 Application was pending, the Examiner would have understood that braided rope made of gel spun polyolefins and braided fishing line made of gel spun polyolefins were both known and that therefore, the drawing steps of Hogenboom, the reference cited by the Examiner, or other references that teach heat stretching of braided rope to increase tenacity, would be obvious to apply to the braided fishing line of Gibbs, therefore rendering independent claims 1, 16, 27 and 38 and all claims dependent thereon, obvious and unpatentable.

99.     In the Response to the Office Action filed on or about September 29, 1997, the Patentee made the following statements to the Examiner:  "Hogenboom says nothing about fishing lines, [and] draws no correlations between rope manufacture and fishing line production." "No reference has been cited to bridge the gap between these two technologies."

100.     Gibbs and the Berkley prior art braided gel spun polyolefin fishing lines are material and not cumulative because of, *inter alia*, the statements made in paragraphs 33 and 99 above.  The Patentee was aware of Gibbs and the Berkley prior art braided gel spun polyolefin fishing lines during prosecution of the '995 Application and failed to disclose them with specific intent to deceive the Patent Office.  The '214 Patent would not have issued but for the failure to disclose Gibbs or the Berkley prior art braided gel spun polyolefin fishing lines, alone or in combination with the other material prior art that the Patentee was aware of but failed to disclose and/or the Patentee's other material misrepresentations and omissions, all as alleged herein.

101.    <u>U.S. Patent No. 4,297,835 (the "835 Patent")</u>.  A copy of the '835 Patent is attached hereto as EXHIBIT F and incorporated herein.  During the prosecution of the '990 Patent, the '835 Patent was cited by the Patent Examiner in an office action dated October 24, 1995.

102.    During the prosecution of the '597 Patent, the '835 Patent was submitted to the Patent Office by the Patentee in an IDS received by the Patent Office on May 28, 1996.

103.    The '995 Application issued as the '214 Patent on May 12, 1998.  The Patentee was familiar with the '835 Patent, knew it was material, and could have submitted it to the Patent Office in connection with the '995 Application, but did not do so.

104.    The '835 Patent discloses a nylon or synthetic string or line made of a plurality of twisted filaments that are heat stretched and can be colored.  Spectra is a synthetic line.

105.    The '835 Patent discloses that the line can be used as a fishing line.

106.    Column 1, Lines 5-8 of the '835 Patent recites "The background of the invention will be described on the use of the string for the racket string and the fishing line, which are the principal uses of the string of the present invention."

107.    Column 2, Lines 4-7 recites "It will be well understood that the string according to the present invention is sufficiently provided with properties that satisfy the requirements of fishing nets and fishing lines."

108.    The '835 Patent discloses at Column 2, Lines 63-69 "in the primary process, a string is twisted and wound up on a bobbin, but remains not drawn, then drawn to provide a desired thickness in the secondary process, not shown. Explanation on the secondary process will be omitted as the secondary process is the drawing and heat setting process well known [sic]."

109.    A person of ordinary skill in the art would readily recognize that the '835 Patent shows that it is well known to twist, heat and draw synthetic yarns like Spectra to make a high tenacity fishing line.

110.    As to specific temperatures, upon a reading of the '835 Patent, a person of ordinary skill in the art would choose the proper temperature for heat stretching based upon the softening or melting temperature of the material that comprises the line.

111.    Column 1, Lines 63-67 of the '835 Patent recites "The string according to the present invention as hereinbefore described is a multi-filament string integrated by twisting into a substantially single string having a tensile strength exceeding the standard tensile strength of the equivalent nylon mono-filament by 1 to 3 Kgs."

112.    Based on the recitation in paragraph 111 above, one of ordinary skill in the art would understand that the number of yarns for fishing lines would include the range of 3-64, as is recited in the claims of the '214 Patent.

113.    Although the '835 Patent does not discuss the specific denier of the yarns, one of ordinary skill in the art, upon a reading of the '835 Patent, would understand that the deniers for fishing lines would include the range of 20-1000 denier that is recited in the claims of the '214 Patent.

114.    Column 3, Line 41 of the '835 Patent states "then drawn 4 to 5 times in the drawing process to produce a finished string."

115.    The '835 Patent discloses using mineral oil to color the line.  *See* Column 5, Lines 39-44.  *See* also Column 5, Line 49 through Column 6, Line 2.

116.    During prosecution of the '995 Application, the Patentee argued that "Hogenboom also does not teach or suggest a process that adds coloring agents with mineral oil."

117.    The Patentee was aware of the fact that the '835 Patent discloses the coloring of twisted, synthetic fishing lines.

118.    The '835 Patent is material to claims 1-43 of the '214 Patent.

119.    The '835 Patent, as is described in paragraphs 104-109 above, is material to the claim 1 limitation "A process for increasing tenacity in a twisted or braided fishing line made of gel spun polyolefin yarns."

120.    The '835 Patent, as is described in paragraphs 104-109 above, is material to the claim 16 limitation "A braided fishing line made from gel spun polyolefin yarns."

121.    The '835 Patent, as is described in paragraphs 104-109 above, is material to the claim 27 limitation "A twisted fishing line made from gel spun polyolefin yarns."

122.    The '835 Patent, as is described in paragraphs 104-109 above, is material to the claim 38 limitation "A process for making a fishing line made of gel spun polyolefin yarns."

123.    The '835 Patent, as is described in paragraphs 104, 108, 109, and 111-112 above, is material to the claim 1 limitation "stretching a braided or twisted line of 3-64 gel spun polyolefin yarns."

124.    The '835 Patent, as is described in paragraphs 104, 108, 109, and 111-112 above, is material to the claim 16 limitation "stretching a braided line of 3-64 gel spun polyolefin filament yarns."

125.    The '835 Patent, as is described in paragraphs 104, 108, 109, and 111-112 above, is material to the claim 27 limitation "stretching a twisted line of 3-64 gel spun polyolefin filament yarns."

126.    The '835 Patent, as is described in paragraphs 104, 108, 109, and 111-112 above, is material to the claim 38 limitation "stretching a braided or twisted line of gel spun polyolefin yarns."

127.    The '835 Patent, as is described in paragraph 114 above, is material to the claim 2 limitation "wherein said stretching comprises stretching said line in at least two draw stations."

128.    The '835 Patent, as is described in paragraph 114 above, is material to the claim 3 limitation "wherein said stretching comprises stretching said line in three draw stations."

129.    The '835 Patent, as is described in paragraphs 104 and 115-117 above, is material to the claim 9 and claim 43 limitation "adding color to said line by coating the line with a mineral oil containing a dye or pigment before the stretching step."

130.    The '835 Patent, as is described in paragraphs 104 and 115-11 above, is material to the claim 10 and claim 42 limitation "adding color to said line by coating the line with a copolymer of ethylene-acrylic acid containing a dye or pigment before the stretching step."

131.    The '835 Patent, as is described in paragraphs 104 and 115-117 above, is material to the claim 24 and claim 35 limitation "wherein color has been imparted to said line by coating the braided line with a mineral oil containing a dye or pigment before said stretching step."

132.    The '835 Patent, as is described in paragraphs 104 and 115-117 above, is material to the claim 25 and claim 36 limitation "wherein color has been imparted to said line by coating the braided line with an ethylene-acrylic acid copolymer containing a dye or pigment before said stretching step."

133.    The '835 Patent, as is described in paragraph 110 above, is material to the claim 1 limitation "at a temperature within the range from about 110° C to about 150° C."

134.    The '835 Patent, as is described in paragraph 110 above, is material to the claim 11 limitation "wherein said line is stretched at a temperature within the range of 110°-115° C."

135.    The '835 Patent, as is described in paragraph 110 above, is material to the claim 12 limitation "wherein said line is stretched at a temperature within the range of 120°-128° C."

136.    The '835 Patent, as is described in paragraph 110 above, is material to the claim 14 limitation "wherein said line is stretched at a temperature within the range of 140°-145° C."

137.    The '835 Patent, as is described in paragraph 110 above, is material to the claim 15 limitation "passing the stretched line through an oven at a temperature within the range of 140°-145° C.

138.    The '835 Patent, as is described in paragraph 110 above, is material to the claim 16 limitation "under tension at a temperature within the range from about 110° C. to about 150° C."

139.    The '835 Patent, as is described in paragraph 110 above, is material to the claim 17 limitation "wherein said line has been stretched at a temperature within the range from about 1100° C [sic]. to about 150° C."

140.    The '835 Patent, as is described in paragraph 110 above, is material to the claim 18 limitation "wherein said line has been stretched at a temperature within the range from about 110° C. to about 150° C."

141.    The '835 Patent, as is described in paragraph 110 above, is material to the claim 19 limitation "wherein said line has been stretched at a temperature within the range of 110°-115° C."

142.    The '835 Patent, as is described in paragraph 110 above, is material to the claim 20 limitation "wherein said line has been stretched at a temperature within the range of 120°-128° C."

143.    The '835 Patent, as is described in paragraph 110 above, is material to the claim 22 limitation "wherein said line has been stretched at a temperature within the range of 140°-145° C."

144.    The '835 Patent, as is described in paragraph 110 above, is material to the claim 23 limitation "wherein the stretched line has been further treated by passing the stretched line through an oven at a temperature within the range of 140°-148° C."

145.    The '835 Patent, as is described in paragraph 110 above, is material to the claim 27 limitation "under tension at a temperature within the range from about 110° C. to about 150°C."

146.    The '835 Patent, as is described in paragraph 110 above, is material to the claim 28 limitation "wherein said line has been stretched at a temperature within the range from about 110° C. to about 150° C."

147.    The '835 Patent, as is described in paragraph 110 above, is material to the claim 29 limitation "wherein said line has been stretched at a temperature within the range from about 110° C. to about 150° C."

148.    The '835 Patent, as is described in paragraph 110 above, is material to the claim 30 limitation "wherein said line has been stretched at a temperature within the range of 110°-115° C."

149.    The '835 Patent, as is described in paragraph 110 above, is material to the claim 31 limitation "wherein said line has been stretched at a temperature within the range of 120°-1280 C. [sic]"

150.    The '835 Patent is material to the claim 33 limitation "wherein said line has been stretched at a temperature within the range of 140°-145° C.

151.    The '835 Patent, as is described in paragraph 110 above, is material to the claim 34 limitation "wherein the stretched line has been further treated by passing the stretched line through an oven at a temperature within the range of 140°-148° C."

152.    The '835 Patent, as is described in paragraph 110 above, is material to the claim 38 limitation "at a temperature within the range from about 110° C. to about 150° C."

153.    The '835 Patent, as is described in paragraph 110 above, is material to the claim 38 limitation "passing the stretched line through an oven at a temperature within the range of 140°-148° C."

154.    The '835 Patent, as is described in paragraph 110 above, is material to the claim 39 limitation "wherein said line is stretched at a temperature within the range of 110°-115° C."

155.    The '835 Patent, as is described in paragraph 110 above, is material to the claim 40 limitation "wherein said line is stretched at a temperature within the range of 120°-128° C."

156.    The '835 Patent, as is described in paragraph 113 above, is material to the claim 1 limitation "wherein each yarn is within the range from about 20 denier to about 1000 denier."

157.    The '835 Patent, as is described in paragraph 113 above, is material to the claim 16 limitation "wherein each yarn is within the range from about 20 denier to about 1000 denier."

158.    The '835 Patent, as is described in paragraph 113 above, is material to the claim 27 limitation "wherein each yarn is within the range from about 20 denier to about 1000 denier."

159.     The '835 Patent, as is described in paragraph 113 above, is material to the claim 38 limitation "wherein each yarn is within the range from about 20 denier to about 1000 denier."

160.     The '835 Patent is material to claims 2-15, 17-26, 28-37 and 39-43 of the '214 Patent as they all depend from one of claims 1, 16, 27 or 38.

161.     The '835 Patent teaches simultaneously heating and stretching fishing line made of twisted nylon yarns.

162.     If the '835 Patent was disclosed to the Patent Office during the prosecution of the '995 Application, the Patent Examiner would understand that it is typical to simultaneously heat and stretch fishing line made of twisted synthetic yarns.  Combining the '835 Patent with Hogenboom renders independent claims 1, 16, 27 and 38 of the '214 Patent and all claims dependent thereon, obvious and unpatentable.

163.     In the Response to the Office Action filed on or about September 29, 1997, the Patentee made the following statements to the Examiner:  "Hogenboom says nothing about fishing lines [and] draws no correlations between rope manufacture and fishing line production." "Hogenboom also does not teach or suggest a process that adds coloring agents with mineral oil or ethylene-acrylic acid copolymer."  "No reference has been cited to bridge the gap between these two technologies to make a prima facie case of obviousness."

164.     The '835 Patent is material and not cumulative because of, *inter alia*, the statements made in paragraphs 33 and 163 above.  The Patentee was aware of the '835 Patent during prosecution of the '995 Application and failed to disclose it with specific intent to deceive the Patent Office.  The '214 Patent would not have issued but for the failure to disclose the '835 Patent, alone or in combination with the other material prior art that the Patentee was aware of

but failed to disclose and/or the Patentee's other material misrepresentations and omissions, all as alleged herein.

165.    U.S. Patent No. 5,573,850 (the "'850 Patent").  A copy of the '850 Patent is attached hereto as EXHIBIT G and incorporated herein.  During the prosecution of the '597 Patent, the '850 Patent was submitted to the Patent Office by the Patentee in an IDS dated April 23, 1997.

166.    The '995 Application issued as the '214 Patent on May 12, 1998.  The Patentee was familiar with the '850 Patent, knew it was material, and could have submitted it to the Patent Office in connection with the '995 Application, but did not do so.

167.    The '850 Patent discloses a fishing line made of heat stretched gel spun, twisted, polyolefins.

168.    Column 1, Lines 16-23 of the '850 Patent recites "Polyethylene yarns having very high tenacity have previously been described in U.S. Pat. Nos. 4,413,110, 4,430,383, 4,436,689, 4,536,536, and 4,545,950.  The nature of the spinning processes used to prepare these yarns is such that individual filaments are typically of low denier and consequently break at low applied loads.  To remedy this, multi-filament yarns may be used or several multi-filament yarns may be formed into a braid."

169.    The '850 Patent discloses making lines of braided gel spun polyolefin yarns.

170.    Column 1, Lines 30-36 of the '850 Patent recites "In such applications it would therefore be highly desirable to have an article of high tenacity and high denier possessing high absolute breaking load together with flexural rigidity and high abrasion resistance. Examples of such applications are sports fishing lines, kite lines, dental floss, "weedeater" lines and tennis racket strings."

171.     The '850 discloses making high tenacity fishing lines.

172.     Column 6, Lines 25-28 of the '850 Patent recites "Preferably the sheathed core yarn is post-stretched at least about 50 percent, more preferably at least about 100 percent, at a temperature within about 10° C of the melting point of the core yarn."  See also Column 4, Lines 49-51.  Column 3, Lines 7-10 of the '850 Patent discloses that the core may be composed of from about 5 to about 9,600 filaments.

173.     Column 2, Lines 43-44 of the '214 Patent recites "Thus, the temperature employed in the present process is within 10° C of the yarn melting point."

174.     Column 7, Line 61 of the '850 Patent recites that Spectra has a melting point of 147° C.

175.     A person of ordinary skill in the art would understand that stretching between 50 percent and 100 percent is the same as a draw ratio of 1.5 to 2.0.

176.     Upon a reading of the '850 Patent a person of ordinary skill in the art would understand that the draw ratio could be between 1.0 and 2.0, as it is a simple matter of design choice.

177.     Column 9, Lines 3-4 of the '850 Patent recites "Post-stretching was conducted in two in-line stages."

178.     Column 4, Lines 53-55 of the '850 Patent recites "The preferred process will depend upon the application; with sports fishing lines, the preferred process includes the optional step of twisting."

179.     Column 6, Lines 40-43 of the '850 Patent recites "The advantageous properties achieved through post-stretching the sheathed core yarn are higher tenacity, higher tensile modulus, lower ultimate elongation and smoother surface texture."

180.    Column 6, Lines 51-56 of the '850 Patent recites "Thus, at equal deniers of the base yarns and final products, the diameter of the quasi monofilament of the present invention is larger than that of the solution coated yarn bundle of the prior art where the coating would primarily lie in the interstices between filaments."

181.    The Examples in the '850 Patent all use Spectra yarns with a denier between 20 and 1000.  See Column 7, Lines 20 and 58; Column 8, Line 57; and Column 9, Lines 12 and 44.

182.    Column 3, Lines 52-57 of the '850 Patent recites "Components of the sheath may include, but are not limited to, high density polyethylene, low density polyethylene, linear low density polyethylene, ethylene copolymers with non-olefinic monomers, ethylene-propylene copolymer, polyethylene wax, antioxidant, colorant and ultraviolet light stabilizer.

183.    The '850 Patent is material to claims 1-43 of the '214 Patent.

184.    The '850 Patent, as is described in paragraphs 167-170 and 178-179 above, is material to the claim 1 limitation "A process for increasing tenacity in a twisted or braided fishing line made of gel spun polyolefin yarns."

185.    The '850 Patent, as is described in paragraphs 167-170 and 178-179 above, is material to the claim 16 limitation "A braided fishing line made from gel spun polyolefin yarns."

186.    The '850 Patent, as is described in paragraphs 167-170 and 178-179 above, is material to the claim 27 limitation "A twisted fishing line made from gel spun polyolefin yarns."

187.    The '850 Patent, as is described in paragraphs 167-170 and 178-179 above, is material to the claim 38 limitation "A process for making a fishing line made of gel spun polyolefin yarns."

188.    The '850 Patent, as is described in paragraphs 167-169 above, is material to the claim 1 limitation "stretching a braided or twisted line of 3-64 gel spun polyolefin yarns."

189.     The '850 Patent, as is described in paragraphs 167-169 above, is material to the claim 16 limitation "stretching a braided line of 3-64 gel spun polyolefin filament yarns."

190.     The '850 Patent, as is described in paragraphs 167-169 above, is material to the claim 27 limitation "stretching a twisted line of 3-64 gel spun polyolefin filament yarns."

191.     The '850 Patent, as is described in paragraphs 167-169 above, is material to the claim 38 limitation "stretching a braided or twisted line of gel spun polyolefin yarns."

192.     The '850 Patent, as is described in paragraph 177 above, is material to the claim 2 limitation "wherein said stretching comprises stretching said line in at least two draw stations."

193.     The '850 Patent, as is described in paragraph 182 above, is material to the claim 9 and claim 43 limitation "adding color to said line by coating the line with a mineral oil containing a dye or pigment before the stretching step."

194.     The '850 Patent, as is described in paragraph 182 above, is material to the claim 10 and claim 42 limitation "adding color to said line by coating the line with a copolymer of ethylene-acrylic acid containing a dye or pigment before the stretching step."

195.     The '850 Patent, as is described in paragraph 182 above, is material to the claim 24 and claim 35 limitation "wherein color has been imparted to said line by coating the braided line with a mineral oil containing a dye or pigment before said stretching step."

196.     The '850 Patent, as is described in paragraph 182 above, is material to the claim 25 and claim 36 limitation "wherein color has been imparted to said line by coating the braided line with an ethylene-acrylic acid copolymer containing a dye or pigment before said stretching step."

197.     The '850 Patent, as is described in paragraphs 172-174 above, is material to the claim 1 limitation "at a temperature within the range from about 110° C. to about 150° C."

198.    The '850 Patent, as is described in paragraphs 172-174 above, is material to the claim 11 limitation "wherein said line is stretched at a temperature within the range of 110°-115° C."

199.    The '850 Patent, as is described in paragraphs 172-174 above, is material to the claim 12 limitation "wherein said line is stretched at a temperature within the range of 120°-128° C."

200.    The '850 Patent, as is described in paragraphs 172-174 above, is material to the claim 14 limitation "wherein said line is stretched at a temperature within the range of 140°-145° C."

201.    The '850 Patent, as is described in paragraphs 172-174 above, is material to the claim 15 limitation "passing the stretched line through an oven at a temperature within the range of 140°-145° C.

202.    The '850 Patent, as is described in paragraphs 172-174 above, is material to the claim 16 limitation "under tension at a temperature within the range from about 110° C. to about 150° C."

203.    The '850 Patent, as is described in paragraphs 172-174 above, is material to the claim 17 limitation "wherein said line has been stretched at a temperature within the range from about 1100° C [sic]. to about 150° C."

204.    The '850 Patent, as is described in paragraphs 172-174 above, is material to the claim 18 limitation "wherein said line has been stretched at a temperature within the range from about 110° C. to about 150° C."

205.    The '850 Patent, as is described in paragraphs 172-174 above, is material to the claim 19 limitation "wherein said line has been stretched at a temperature within the range of 110°-115° C."

206.    The '850 Patent, as is described in paragraphs 172-174 above, is material to the claim 20 limitation "wherein said line has been stretched at a temperature within the range of 120°-128° C."

207.    The '850 Patent, as is described in paragraphs 172-174 above, is material to the claim 22 limitation "wherein said line has been stretched at a temperature within the range of 140°-145° C."

208.    The '850 Patent, as is described in paragraphs 172-174 above, is material to the claim 23 limitation "wherein the stretched line has been further treated by passing the stretched line through an oven at a temperature within the range of 140°-148° C."

209.    The '850 Patent, as is described in paragraphs 172-174 above, is material to the claim 27 limitation "under tension at a temperature within the range from about 110° C. to about 150° C."

210.    The '850 Patent, as is described in paragraphs 172-174 above, is material to the claim 28 limitation "wherein said line has been stretched at a temperature within the range from about 110° C. to about 150° C."

211.    The '850 Patent, as is described in paragraphs 172-174 above, is material to the claim 29 limitation "wherein said line has been stretched at a temperature within the range from about 110° C. to about 150° C."

212.    The '850 Patent, as is described in paragraphs 172-174 above, is material to the claim 30 limitation "wherein said line has been stretched at a temperature within the range of 110°-115° C."

213.    The '850 Patent, as is described in paragraphs 172-174 above, is material to the claim 31 limitation "wherein said line has been stretched at a temperature within the range of 120°-1280 C. [sic]"

214.    The '850 Patent, as is described in paragraphs 172-174 above, is material to the claim 33 limitation "wherein said line has been stretched at a temperature within the range of 140°-145° C.

215.    The '850 Patent, as is described in paragraphs 172-174 above, is material to the claim 34 limitation "wherein the stretched line has been further treated by passing the stretched line through an oven at a temperature within the range of 140°-148° C."

216.    The '850 Patent, as is described in paragraphs 172-174 above, is material to the claim 38 limitation "at a temperature within the range from about 110° C. to about 150° C."

217.    The '850 Patent, as is described in paragraphs 172-174 above, is material to the claim 38 limitation "passing the stretched line through an oven at a temperature within the range of 140°-148° C."

218.    The '850 Patent, as is described in paragraphs 172-174 above, is material to the claim 39 limitation "wherein said line is stretched at a temperature within the range of 110°-115° C."

219.    The '850 Patent, as is described in paragraphs 172-174 above, is material to the claim 40 limitation "wherein said line is stretched at a temperature within the range of 120°-128° C."

220.    The '850 Patent, as is described in paragraph 181 above, is material to the claim 1 limitation "wherein each yarn is within the range from about 20 denier to about 1000 denier."

221.    The '850 Patent, as is described in paragraph 181 above, is material to the claim 16 limitation "wherein each yarn is within the range from about 20 denier to about 1000 denier."

222.    The '850 Patent, as is described in paragraph 181 above, is material to the claim 27 limitation "wherein each yarn is within the range from about 20 denier to about 1000 denier."

223.    The '850 Patent, as is described in paragraph 181 above, is material to the claim 38 limitation "wherein each yarn is within the range from about 20 denier to about 1000 denier."

224.    The '850 Patent, as is described in paragraphs 172 and 175-176 above, is material to the claim 1 limitation "at a total draw ratio within the range from about 1.0 to about 2.0."

225.    The '850 Patent, as is described in paragraphs 172 and 175-176 above, is material to the claim 16 limitation "at a total draw ratio within the range from about 1.0 to about 1.4."

226.    The '850 Patent, as is described in paragraphs 172 and 175-176 above, is material to the claim 27 limitation "at a total draw ratio within the range from about 1.0 to about 1.4."

227.    The '850 Patent, as is described in paragraphs 172 and 175-176 above, is material to the claim 38 limitation "at a total draw ratio within the range from about 1.0 to about 2.0."

228.    The '850 Patent, as is described in paragraphs 172 and 175-176 above, is material to the claim 4 limitation "wherein said stretching comprises stretching said line at a total draw ratio within the range from about 1.05 to about 1.5."

229.    The '850 Patent, as is described in paragraphs 172 and 175-176 above, is material to the claim 5 limitation "wherein said stretching comprises stretching said line at a total draw ratio within the range from about 1.1 to about 1.4."

230.    The '850 Patent, as is described in paragraphs 172 and 175-176 above, is material to the claim 6 limitation "wherein said stretching comprises stretching said line at a total draw ratio within the range from about 1.15 to about 1.35."

231.    The '850 Patent, as is described in paragraphs 172 and 175-176 above, is material to the claim 11 limitation "at a total draw ratio within the range of 1.05-1.3."

232.    The '850 Patent, as is described in paragraphs above, is material to the claim 12 limitation "at a total draw ratio within the range of 1.00-1.30."

233.    The '850 Patent, as is described in paragraphs 172 and 175-176 above, is material to the claim 13 limitation "wherein said line is stretched at a total draw ratio within the range of 1.025-1.3."

234.    The '850 Patent, as is described in paragraphs 172 and 175-176 above, is material to the claim 14 limitation "at a total draw ratio within the range of 1.00-1.30."

235.    The '850 Patent, as is described in paragraphs 172 and 175-176 above, is material to the claim 15 limitation "at a total draw ratio within the range of 1.00-1.30."

236.    The '850 Patent, as is described in paragraphs 172 and 175-176 above, is material to the claim 17 limitation "at a total draw ratio within the range from about 1.1 to about 1.35."

237.    The '850 Patent, as is described in paragraphs 172 and 175-176 above, is material to the claim 18 limitation "at a total draw ratio within the range from about 1.15 to about 1.35."

238.    The '850 Patent, as is described in paragraphs 172 and 175-176 above, is material to the claim 19 limitation "at a total draw ratio within the range of 1.05-1.3."

239.    The '850 Patent, as is described in paragraphs 172 and 175-176 above, is material to the claim 20 limitation "at a total draw ratio within the range of 1.00-1.30."

240.    The '850 Patent, as is described in paragraphs 172 and 175-176 above, is material to the claim 21 limitation "at a total draw ratio within the range of 1.025-1.3."

241.    The '850 Patent, as is described in paragraphs 172 and 175-176 above, is material to the claim 22 limitation "at a total draw ratio within the range of 1.00-1.30."

242.    The '850 Patent, as is described in paragraphs 172 and 175-176 above, is material to the claim 28 limitation "at a total draw ratio within the range from about 1.1 to about 1.35."

243.    The '850 Patent, as is described in paragraphs 172 and 175-176 above, is material to the claim 29 limitation "at a total draw ratio within the range from about 1.15 to about 1.35."

244.    The '850 Patent, as is described in paragraphs 172 and 175-176 above, is material to the claim 30 limitation "at a total draw ratio within the range from about 1.0 to about 1.4."

245.    The '850 Patent, as is described in paragraphs 172 and 175-176 above, is material to the claim 31 limitation "at a total draw ratio within the range of 1.00-1.30."

246.    The '850 Patent, as is described in paragraphs 172 and 175-176 above, is material to the claim 32 limitation "at a total draw ratio within the range of 1.025-1.3."

247.    The '850 Patent, as is described in paragraphs 172 and 175-176 above, is material to the claim 33 limitation "at a total draw ratio within the range of 1.00-1.30."

248.    The '850 Patent, as is described in paragraphs 172 and 175-176 above, is material to the claim 39 limitation "at a total draw ratio within the range of 1.05-1.3."

249.    The '850 Patent, as is described in paragraphs 172 and 175-176 above, is material to the claim 40 limitation "at a total draw ratio within the range of 1.00-1.30."

250.    The '850 Patent, as is described in paragraphs 172 and 175-176 above, is material to the claim 41 limitation "at a total draw ratio within the range of 1.025-1.3."

251.    According to the '850 Patent, a problem with gel spun polyethylene yarns is such that individual filaments are typically of low denier and consequently break at low applied loads.

252.    According to the '850 Patent, one way to remedy the problem set forth in paragraph 251 above is to form several multi-filament yarns into a braid.

253.    According to the '850 Patent, another way to remedy the problem set forth in paragraph 251 is the subject of the specification of the '850 Patent.

254.    The '850 discloses a high tenacity fishing line that is made of a multi-filament (about 5 to about 9,600 filaments) gel-spun polyolefin yarn(s) that is heat stretched at a temperature within 10° C of its melting point and a draw ratio between 1.5 and 2.0.

255.    During prosecution of the '995 Application, the Patentee represented to the Patent examiner that braided rope made of gel spun polyolefins had nothing to do with fishing line.

256.    It would be obvious to a person of ordinary skill in the art, upon a review of the '850 Patent, to solve the problem set forth in paragraph 251 above by substituting the gel-spun polyolefin yarn discussed in paragraph 254 above with the braid of multi-filament gel-spun polyolefin yarns discussed in paragraph 252, thereby rendering the claims of the '214 Patent unpatentable.

257.    The '850 Patent is material and not cumulative because of, *inter alia*, the statements made in paragraphs 33 and 99 above.  The Patentee was aware of the '850 Patent during prosecution of the '995 Application and failed to disclose it with specific intent to deceive the Patent Office.  The '214 Patent would not have issued but for the failure to disclose the '850 Patent, alone or in combination with the other material prior art that the Patentee was aware of but failed to disclose and/or the Patentee's other material misrepresentations and omissions, all as alleged herein.

258.    U.S. Patent No. 5,601,775 (the "'775 Patent").  A copy of the '775 Patent is attached hereto as EXHIBIT H and incorporated herein.  During the prosecution of the '597 Patent, the '775 Patent was submitted to the Patent Office by the Patentee in an IDS dated April 23, 1997.

259.    The '995 Application issued as the '214 Patent on May 12, 1998.  The Patentee was familiar with the '775 Patent, knew it was material, and could have submitted it to the Patent Office in connection with the '995 Application, but did not do so.

260.    The '775 Patent discloses a process for making a fishing line made of heat stretched gel spun, twisted polyolefins.

261.    Column 1, Lines 15-22 of the '775 Patent recites "Polyethylene yarns having very high tenacity have previously been described in U.S. Pat. Nos. 4,413,110, 4,430,383, 4,436,689, 4,536,536, and 4,545,950. The nature of the spinning processes used to prepare these yarns is such that individual filaments are typically of low denier and consequently break at low applied loads. To remedy this, multi-filament yarns may be used or several multi-filament yarns may be formed into a braid."

262.    The '775 Patent discloses making lines of braided gel spun polyolefin yarns.

263.    Column 1, Lines 29-35 of the '775 Patent recites "In such applications it would therefore be highly desirable to have an article of high tenacity and high denier possessing high absolute breaking load together with flexural rigidity and high abrasion resistance. Examples of such applications are sports fishing lines, kite lines, dental floss, "weedeater" lines and tennis racket strings."

264.    The '775 Patent discloses making high tenacity fishing lines.

265.    Column 6, Lines 52-55 of the '775 Patent recites "Preferably the sheathed core yarn is post-stretched at least about 50 percent, more preferably at least about 100 percent, at a temperature within about 10° C of the melting point of the core yarn."  See also Column 5, Lines 9-11 and Column 2, Lines 27-29.  Column 3, Lines 34-36 of the '775 Patent discloses that the core may be composed of from about 5 to about 9,600 filaments.

266.    Column 2, Lines 43-44 of the '214 Patent recites "Thus, the temperature employed in the present process is within 10° C of the yarn melting point."

267.    Column 7, Line 50 of the '775 Patent recites that Spectra has a melting point of 147° C.

268.    A person of ordinary skill in the art would understand that stretching between 50 percent and 100 percent is the same as a draw ratio of 1.5 to 2.0.

269.    Upon a reading of the '775 Patent a person of ordinary skill in the art would understand that the draw ratio could be between 1.0 and 2.0, as it is a simple matter of design choice.

270.    Column 9, Lines 27-28 of the '775 Patent recites "Post-stretching was conducted in two in-line stages."

271.    Column 5, Lines 12-15 of the '775 Patent recites "The preferred process will depend upon the application; with sports fishing lines, the preferred process includes the optional step of twisting."

272.    Column 6, line 67 through Column 7, line 3 of the '775 Patent recites "The advantageous properties achieved through post-stretching the sheathed core yarn are higher tenacity, higher tensile modulus, lower ultimate elongation and smoother surface texture."

273.    Column 7, Lines 11-16 of the '775 Patent recites "Thus, at equal deniers of the base yarns and final products, the diameter of the quasi monofilament of the present invention is larger than that of the solution coated yarn bundle of the prior art where the coating would primarily lie in the interstices between filaments."

274.    The Examples in the '775 Patent all use Spectra yarns with a denier between 20 and 1000.  See Column 7, line 47; Column 8, line 17; and Column 9, Lines 13, 36 and 69.

275.    Column 4, Lines 11-16 of the '775 Patent recites "Components of the sheath may include, but are not limited to, high density polyethylene, low density polyethylene, linear low density polyethylene, ethylene copolymers with non-olefinic monomers, ethylene-propylene copolymer, polyethylene wax, antioxidant, colorant and ultraviolet light stabilizer.

276.    The '775 Patent is material to claims 1-43 of the '214 Patent.

277.    The '775 Patent, as is described in paragraphs 260-264 and 271-272 above, is material to the claim 1 limitation "A process for increasing tenacity in a twisted or braided fishing line made of gel spun polyolefin yarns."

278.    The '775 Patent, as is described in paragraphs 260-264 and 271-272 above, is material to the claim 16 limitation "A braided fishing line made from gel spun polyolefin yarns."

279.    The '775 Patent, as is described in paragraphs 260-264 and 271-272 above, is material to the claim 27 limitation "A twisted fishing line made from gel spun polyolefin yarns."

280.    The '775 Patent, as is described in paragraphs 260-264 and 271-272 above, is material to the claim 38 limitation "A process for making a fishing line made of gel spun polyolefin yarns."

281.    The '775 Patent, as is described in paragraphs 260-262 above, is material to the claim 1 limitation "stretching a braided or twisted line of 3-64 gel spun polyolefin yarns."

282. The '775 Patent, as is described in paragraphs 260-262 above, is material to the claim 16 limitation "stretching a braided line of 3-64 gel spun polyolefin filament yarns."

283. The '775 Patent, as is described in paragraphs 260-262 above, is material to the claim 27 limitation "stretching a twisted line of 3-64 gel spun polyolefin filament yarns."

284. The '775 Patent, as is described in paragraphs 260-262 above, is material to the claim 38 limitation "stretching a braided or twisted line of gel spun polyolefin yarns."

285. The '775 Patent, as is described in paragraphs 270 above, is material to the claim 2 limitation "wherein said stretching comprises stretching said line in at least two draw stations."

286. The '775 Patent, as is described in paragraph 275 above, is material to the claim 9 and claim 43 limitation "adding color to said line by coating the line with a mineral oil containing a dye or pigment before the stretching step."

287. The '775 Patent, as is described in paragraph 275 above, is material to the claim 10 and claim 42 limitation "adding color to said line by coating the line with a copolymer of ethylene-acrylic acid containing a dye or pigment before the stretching step."

288. The '775 Patent, as is described in paragraph 275 above, is material to the claim 24 and claim 35 limitation "wherein color has been imparted to said line by coating the braided line with a mineral oil containing a dye or pigment before said stretching step."

289. The '775 Patent, as is described in paragraph 275 above, is material to the claim 25 and claim 36 limitation "wherein color has been imparted to said line by coating the braided line with an ethylene-acrylic acid copolymer containing a dye or pigment before said stretching step."

290. The '775 Patent, as is described in paragraphs 265-267 above, is material to the claim 1 limitation "at a temperature within the range from about 110° C. to about 150° C."

291.    The '775 Patent, as is described in paragraphs 265-267 above, is material to the claim 11 limitation "wherein said line is stretched at a temperature within the range of 110°-115° C."

292.    The '775 Patent, as is described in paragraphs 265-267 above, is material to the claim 12 limitation "wherein said line is stretched at a temperature within the range of 120°-128° C."

293.    The '775 Patent, as is described in paragraphs 265-267 above, is material to the claim 14 limitation "wherein said line is stretched at a temperature within the range of 140°-145° C."

294.    The '775 Patent, as is described in paragraphs 265-267 above, is material to the claim 15 limitation "passing the stretched line through an oven at a temperature within the range of 140°-145° C.

295.    The '775 Patent, as is described in paragraphs 265-267 above, is material to the claim 16 limitation "under tension at a temperature within the range from about 110° C. to about 150° C."

296.    The '775 Patent, as is described in paragraphs 265-267 above, is material to the claim 17 limitation "wherein said line has been stretched at a temperature within the range from about 1100° C [sic]. to about 150° C."

297.    The '775 Patent, as is described in paragraphs 265-267 above, is material to the claim 18 limitation "wherein said line has been stretched at a temperature within the range from about 110° C. to about 150° C."

298.     The '775 Patent, as is described in paragraphs 265-267 above, is material to the claim 19 limitation "wherein said line has been stretched at a temperature within the range of 110°-115° C."

299.     The '775 Patent, as is described in paragraphs 265-267 above, is material to the claim 20 limitation "wherein said line has been stretched at a temperature within the range of 120°-128° C."

300.     The '775 Patent, as is described in paragraphs 265-267 above, is material to the claim 22 limitation "wherein said line has been stretched at a temperature within the range of 140°-145° C."

301.     The '775 Patent, as is described in paragraphs 265-267 above, is material to the claim 23 limitation "wherein the stretched line has been further treated by passing the stretched line through an oven at a temperature within the range of 140°-148° C."

302.     The '775 Patent, as is described in paragraphs 265-267 above, is material to the claim 27 limitation "under tension at a temperature within the range from about 110° C. to about 150° C."

303.     The '775 Patent, as is described in paragraphs 265-267 above, is material to the claim 28 limitation "wherein said line has been stretched at a temperature within the range from about 110° C. to about 150° C."

304.     The '775 Patent, as is described in paragraphs 265-267 above, is material to the claim 29 limitation "wherein said line has been stretched at a temperature within the range from about 110° C. to about 150° C."

305.    The '775 Patent, as is described in paragraphs 265-267 above, is material to the claim 30 limitation "wherein said line has been stretched at a temperature within the range of 110°-115° C."

306.    The '775 Patent, as is described in paragraphs 265-267 above, is material to the claim 31 limitation "wherein said line has been stretched at a temperature within the range of 120°-1280 C. [sic]"

307.    The '775 Patent, as is described in paragraphs 265-267 above, material to the claim 33 limitation "wherein said line has been stretched at a temperature within the range of 140°-145° C.

308.    The '775 Patent, as is described in paragraphs 265-267 above, is material to the claim 34 limitation "wherein the stretched line has been further treated by passing the stretched line through an oven at a temperature within the range of 140°-148° C."

309.    The '775 Patent, as is described in paragraphs 265-267 above, is material to the claim 38 limitation "at a temperature within the range from about 110° C. to about 150° C."

310.    The '775 Patent, as is described in paragraphs 265-267 above, is material to the claim 38 limitation "passing the stretched line through an oven at a temperature within the range of 140°-148° C."

311.    The '775 Patent, as is described in paragraphs 265-267 above, is material to the claim 39 limitation "wherein said line is stretched at a temperature within the range of 110°-115° C."

312.    The '775 Patent, as is described in paragraphs 265-267 above, is material to the claim 40 limitation "wherein said line is stretched at a temperature within the range of 120°-128° C."

313.     The '775 Patent, as is described in paragraphs 274 above, is material to the claim 1 limitation "wherein each yarn is within the range from about 20 denier to about 1000 denier."

314.     The '775 Patent, as is described in paragraph 274 above, is material to the claim 16 limitation "wherein each yarn is within the range from about 20 denier to about 1000 denier."

315.     The '775 Patent, as is described in paragraph 274 above, is material to the claim 27 limitation "wherein each yarn is within the range from about 20 denier to about 1000 denier."

316.     The '775 Patent, as is described in paragraph 274 above, is material to the claim 38 limitation "wherein each yarn is within the range from about 20 denier to about 1000 denier."

317.     The '775 Patent, as is described in paragraphs 265 and 268-269 above, is material to the claim 1 limitation "at a total draw ratio within the range from about 1.0 to about 2.0."

318.     The '775 Patent, as is described in paragraphs 265 and 268-269 above, is material to the claim 16 limitation "at a total draw ratio within the range from about 1.0 to about 1.4."

319.     The '775 Patent, as is described in paragraphs 265 and 268-269 above, is material to the claim 27 limitation "at a total draw ratio within the range from about 1.0 to about 1.4."

320.     The '775 Patent, as is described in paragraphs 265 and 268-269 above, is material to the claim 38 limitation "at a total draw ratio within the range from about 1.0 to about 2.0."

321.     The '775 Patent, as is described in paragraphs 265 and 268-269 above, is material to the claim 4 limitation "wherein said stretching comprises stretching said line at a total draw ratio within the range from about 1.05 to about 1.5."

322.     The '775 Patent, as is described in paragraphs 265 and 268-269 above, is material to the claim 5 limitation "wherein said stretching comprises stretching said line at a total draw ratio within the range from about 1.1 to about 1.4."

323.    The '775 Patent, as is described in paragraphs 265 and 268-269 above, is material to the claim 6 limitation "wherein said stretching comprises stretching said line at a total draw ratio within the range from about 1.15 to about 1.35."

324.    The '775 Patent, as is described in paragraphs 265 and 268-269 above, is material to the claim 11 limitation "at a total draw ratio within the range of 1.05-1.3."

325.    The '775 Patent, as is described in paragraphs 265 and 268-269 above, is material to the claim 12 limitation "at a total draw ratio within the range of 1.00-1.30."

326.    The '775 Patent, as is described in paragraphs 265 and 268-269 above, is material to the claim 13 limitation "wherein said line is stretched at a total draw ratio within the range of 1.025-1.3."

327.    The '775 Patent, as is described in paragraphs 265 and 268-269 above, is material to the claim 14 limitation "at a total draw ratio within the range of 1.00-1.30."

328.    The '775 Patent, as is described in paragraphs 265 and 268-269 above, is material to the claim 15 limitation "at a total draw ratio within the range of 1.00-1.30."

329.    The '775 Patent, as is described in paragraphs 265 and 268-269 above, is material to the claim 17 limitation "at a total draw ratio within the range from about 1.1 to about 1.35."

330.    The '775 Patent, as is described in paragraphs 265 and 268-269 above, is material to the claim 18 limitation "at a total draw ratio within the range from about 1.15 to about 1.35."

331.    The '775 Patent, as is described in paragraphs 265 and 268-269 above, is material to the claim 19 limitation "at a total draw ratio within the range of 1.05-1.3."

332.    The '775 Patent, as is described in paragraphs 265 and 268-269 above, is material to the claim 20 limitation "at a total draw ratio within the range of 1.00-1.30."

333.    The '775 Patent, as is described in paragraphs 265 and 268-269 above, is material to the claim 21 limitation "at a total draw ratio within the range of 1.025-1.3."

334.    The '775 Patent, as is described in paragraphs 265 and 268-269 above, is material to the claim 22 limitation "at a total draw ratio within the range of 1.00-1.30."

335.    The '775 Patent, as is described in paragraphs 265 and 268-269 above, is material to the claim 28 limitation "at a total draw ratio within the range from about 1.1 to about 1.35."

336.    The '775 Patent, as is described in paragraphs 265 and 268-269 above, is material to the claim 29 limitation "at a total draw ratio within the range from about 1.15 to about 1.35."

337.    The '775 Patent, as is described in paragraphs 265 and 268-269 above, is material to the claim 30 limitation "at a total draw ratio within the range from about 1.0 to about 1.4."

338.    The '775 Patent, as is described in paragraphs 265 and 268-269 above, is material to the claim 31 limitation "at a total draw ratio within the range of 1.00-1.30."

339.    The '775 Patent, as is described in paragraphs 265 and 268-269 above, is material to the claim 32 limitation "at a total draw ratio within the range of 1.025-1.3."

340.    The '775 Patent, as is described in paragraphs 265 and 268-269 above, is material to the claim 33 limitation "at a total draw ratio within the range of 1.00-1.30."

341.    The '775 Patent, as is described in paragraphs 265 and 268-269 above, is material to the claim 39 limitation "at a total draw ratio within the range of 1.05-1.3."

342.    The '775 Patent, as is described in paragraphs 265 and 268-269 above, is material to the claim 40 limitation "at a total draw ratio within the range of 1.00-1.30."

343.    The '775 Patent, as is described in paragraphs 265 and 268-269 above, is material to the claim 41 limitation "at a total draw ratio within the range of 1.025-1.3."

344.    According to the '775 Patent, a problem with gel spun polyethylene yarns is such that individual filaments are typically of low denier and consequently break at low applied loads.

345.    According to the '775 Patent, one way to remedy the problem set forth in paragraph 344 above is to form several multi-filament yarns into a braid.

346.    According to the '775 Patent, another way to remedy the problem set forth in paragraph 344 is the subject of the specification of the '775 Patent.

347.    The '775 discloses a high tenacity fishing line that is made of a multi-filament (about 5 to about 9,600 filaments) gel-spun polyolefin yarn(s) that is heat stretched at a temperature within 10° C of its melting point and a draw ratio between 1.5 and 2.0.

348.    During prosecution of the '995 Application, the Patentee represented to the Patent Office that braided rope made of gel spun polyolefins had nothing to do with fishing line.

349.    It would be obvious to a person of ordinary skill in the art, upon a review of the '775 Patent, to solve the problem set forth in paragraph 344 above by substituting the gel-spun polyolefin yarn discussed in paragraph 347 above with the braid of multi-filament gel-spun polyolefin yarns discussed in paragraph 345, thereby rendering the claims of the '214 Patent unpatentable.

350.    The '775 Patent is material and not cumulative because of, *inter alia*, the statements made in paragraphs 33 and 99 above.  The Patentee was aware of the '775 Patent during prosecution of the '995 Application and failed to disclose it with specific intent to deceive the Patent Office.  The '214 Patent would not have issued but for the failure to disclose the '775 Patent, alone or in combination with the other material prior art that the Patentee was aware of but failed to disclose and/or the Patentee's other material misrepresentations and omissions, all as alleged herein.

351.    For all the foregoing reasons, the '214 Patent was procured by inequitable conduct and is unenforceable.

352.    Counterclaim Plaintiffs reserve the right to supplement this counterclaim or add additional counterclaims for inequitable conduct as may be disclosed during the course of discovery.

## PRAYER FOR RELIEF

WHEREFORE, Normark prays for the following relief:

1.    A judgment dismissing the Amended Complaint with prejudice.

2.    A judgment that Normark has not infringed the '214 Patent.

3.    A judgment that one or more claims of the '214 Patent are invalid.

4.    A judgment that the '214 Patent is unenforceable.

5.    A judgment that Normark has not infringed the '525 Patent.

6.    A judgment that one or more claims of the '525 Patent are invalid.

7.    A judgment that this is an exceptional case and an award to Normark of its attorneys' fees and costs under 35 U.S.C. § 285.

8.    Such other and further relief as the Court may deem just and equitable.

## <u>REQUEST FOR JURY TRIAL</u>

Pursuant to Federal Rule of Civil Procedure 38, Normark hereby requests a trial by jury of all issues so triable.

Respectfully submitted,

Dated: June 22, 2011

*/s/ J. Parks Workman*
Tim F. Williams, Fed. ID 6276
J. Parks Workman, Fed. ID 10068
Alan R. Marshall, Fed. ID 9439
DORITY & MANNING, P.A.
55 Beattie Place, Suite 1600
(P.O. Box 1449, Zip 29602)
Greenville, SC 29601
Telephone: (864) 271-1592
Fax: 864-233-7342
timw@dority-manning.com
pworkman@dority-manning.com
amarshall@dority-manning.com


Sri K. Sankaran (*Pro Hac Vice*)
J. Thomas Vitt (*Pro Hac Vice*)
DORSEY & WHITNEY LLP
50 South Sixth Street, Suite 1500
Minneapolis, MN 55402-1498
Telephone: (612) 340-2600
FAX: (612) 340-2868
sankaran.sri@dorsey.com
vitt.thomas@dorsey.com

***Attorneys For Defendant***
***Normark Corporation***

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 22nd day of June 2011, the foregoing **AMENDED ANSWER**

**AND COUNTERCLAIM** was filed with the Court using the Electronic Court Filing (ECF)

system which provides service to the following counsel of record:

James H. Fowles, III
Douglas J. Rosinski
Christoper J. Near
Ogletree, Deakins, Nash, Smoak & Stewart, PC
1320 Main Street, Suite 600
Columbia, SC 29201

Thomas G. Pasternak
Jennifer L. Travers
Steptoe & Johnson LLP
115 South LaSalle Street
Suite 3100
Chicago, IL 60603

  */s/ J. Parks Workman*
Tim F. Williams, Fed. ID 6276
J. Parks Workman, Fed. ID 10068
Alan R. Marshall, Fed. ID 9439
DORITY & MANNING, P.A.
55 Beattie Place, Suite 1600
(P.O. Box 1449, Zip 29602)
Greenville, SC 29601
Tel: 864-271-1592
Fax: 864-233-7342
timw@dority-manning.com
pworkman@dority-manning.com
amarshall@dority-manning.com

***Attorneys for Defendant***
***Normark Corporation***