**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION**

| | | |
|---|---|---|
| PURE FISHING, INC., an Iowa Corporation, | ) | C.A. No. 10-cv-2140-CMC |
| | ) | |
| Plaintiff, | ) | OPINION AND ORDER |
| | ) | ATTORNEY FEES AND |
| v. | ) | SANCTIONS MOTIONS |
| | ) | |
| NORMARK CORPORATION, a Minnesota | ) | |
| Corporation, d/b/a RAPALA, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

This matter is before the court on motions of Defendant Normark Corporation ("Normark") for sanctions and attorney fees. Dkt. Nos. 351, 352, 353. For the reasons set forth below, the motions for sanctions and attorney fees relating to the claims of infringement of U.S. Patent No. 5,749,214 ("Cook Patent"), Dkt. Nos. 351 and 353, are denied. The motion for attorney fees relating to the claim of infringement of U.S. Patent No. 6,174,525 ("Kelley Patent"), Dkt. No. 352, is granted in part and denied in part.[1] Specifically, the court awards attorney fees against Plaintiff, Pure Fishing, Inc. ("Pure Fishing"), in the amount of $77,562.75, arising from Normark's defense of the Kelley Claim from November 3, 2011, through January 17, 2012, of which $17,900 is for pursuit of Normark's motion for attorney fees.

**STANDARDS**

Normark relies on 35 U.S.C. § 285 ("Section 285") in pursuing attorney fees and expenses for both the Cook and Kelley Claims. Normark also relies on Rule 11 of the Federal Rules of Civil

---

[1] The original and first amended complaints asserted two claims, one of infringement of the Cook Patent and one of infringement of the Kelley Patent. Dkt. Nos. 1, 60. The second amended complaint, filed after dismissal of the claim of infringement of the Kelley Patent ("Kelley Claim"), included two claims of infringement of the Cook Patent ("Cook Claims"). Dkt. No. 200.

Procedure in pursuing sanctions and fees for the Cook Claims. The standards applicable to both are set out below.

## I.    SECTION 285

### A.    Three Requirements

Section 285 provides as follows: "The court in exceptional cases may award reasonable attorney fees to the prevailing party." 35 U.S.C. § 285. Thus, the threshold requirement for an award under Section 285 is that the moving party be the prevailing party. In addition, the moving party must establish by clear and convincing evidence that the case is "exceptional." *E.g.*, *Highmark, Inc. v. Allcare Health Mgmt. Sys., Inc.*, 687 F.3d 1300, 1308 (Fed. Cir. 2012).[2] If the first two requirements are met, then the court exercises its discretion in deciding whether an award of attorney fees is appropriate and, if so, how much to award. *Highmark*, 687 F.3d at 1308. The requirements and applicable standards for each step are addressed in detail below.

---

[2] In a recent decision, a Federal Circuit panel indicated a favorable view of defendant's arguments that it "should not be required to prove exceptionality by clear and convincing evidence" to be eligible for attorney fees under Section 285 and a related argument that it should not be required to prove subjective bad faith to establish that the case was exceptional. *Kilopass Tech., Inc. v. Sidense Corp.*, __ F.3d __, 2013 WL 680085, Slip. Op. No. 2013-1193 at **9-13 (Fed. Cir. Dec. 26, 2013). The panel, nonetheless, concluded that adopting either argument would modify prior precedent, placing those determinations beyond the panel's authority. *Id.* at **11, 13. Based on its separate clarification of the inference that might be drawn from proof of objective baselessness, the court, nonetheless, noted that "retention of the subjective bad faith requirement may prove to have little effect on this case, as well as many that follow." *Id.* at *11. A concurring opinion "endorse[d]" both changes and expressed hope that the "court [would] return to its original binding precedent on fee-shifting," which provided district courts with broad discretion to award fees under Section 285. *Id.* at *14. Given this recent precedent and potential for *en banc* review, this court includes alternative rulings regarding certain issues addressed in this order. *See also Octane Fitness, LLC v. Icon Health & Fitness, Inc.*, 134 S. Ct. 49 (U.S. Oct. 1, 2013) (granting *certiorari* to review related issues).

2

### 1.    Prevailing Party

"Federal Circuit law defines 'prevailing party' for purposes of patent litigation." *Shum v. Intel Corp.*, 629 F.3d 1360, 1366 (Fed. Cir. 2010). Discussing the prevailing party standard under Fed. R. Civ. P. 54(d), the Federal Circuit has stated: "For the purposes of costs and fees, there can be only one winner. A court must choose one, and only one, 'prevailing party' to receive any costs award." *Shum*, 629 F.3d at 1367; *see also Highway Equip. Co, Inc. v. FECO, Ltd.*, 469 F.3d 1027, 1035 (Fed. Cir. 2006) (noting Federal Circuit treats the "prevailing party issue under Rule 54 and 35 U.S.C. § 285 similarly.").

A party is not required to prevail on all its claims to be a prevailing party but must "have received at least some relief on the merits" that "materially alter[ed] the legal relationship between the parties" resulting in a direct benefit to the party claiming prevailing party status. *Shum*, 629 F.3d at 1367-68 (addressing prevailing party requirements in context of "mixed judgment case" and finding defendant that avoided any "significant monetary liability" and obtained judgment with *res judicata* effect was the prevailing party despite plaintiff's success in obtaining judgment of co-inventorship on five of seven patents at issue). This may, for example, occur where a court dismisses an action with prejudice following and based on execution of a covenant not to sue. *Highway Equip.*, 469 F.3d at 1035 (noting "dispositive issue [was] whether the dismissal with prejudice had sufficient judicial imprimatur to constitute a 'judicially sanctioned change in the legal relationship of the parties.'").[3]

---

[3] The Federal Circuit noted in *Highway Equip.* that it had previously "held that a defendant was the prevailing party for purposes of costs under Rule 54 where the plaintiff voluntarily dismissed its case against one defendant with prejudice." *Id.* (citing *Power Mosfet Techs., LLC v. Siemens AG*, 378 F.3d 1396 (Fed. Cir. 2004)). As the court explained, "dismissal of a claim with prejudice . . . is a judgment on the merits under the law of the Federal Circuit." *Id.* (quoting *Power Mosfet*, 378 F.3d at 1416.).

As explained in *Brooks Furniture Mfg., Inc. v. Dutailier Int'l., Inc.*, 393 F.3d 1376 (Fed. Cir. 2005), "[d]etermination of the prevailing party is based on the relation of the litigation result to the overall objective of the litigation, and not on a count of the number of claims and defenses" on which the party succeeded. *Brooks*, 393 F.3d at 1381 (affirming finding that plaintiff that successfully obtained declaratory judgment of non-infringement was prevailing party under Section 285, even though it was unsuccessful on or withdrew a number of its defenses, but reversing award of fees due to absence of bad faith by the opposing party).[4]  Under similarly worded statutes, the Federal Circuit has defined prevailing party as one who obtained "an enforceable judgment on the merits or a court-ordered consent decree that materially altered the legal relationship between the parties, or the equivalent of either of those." *Rice Servs., Ltd. v. United States*, 405 F.3d 1017, 1025-26 (Fed. Cir. 2005) (defining term under the Equal Access to Justice Act and noting adopted approach was consistent with majority of circuits that had considered the issue).  On the other end of the spectrum, the Federal Circuit has found no prevailing party where a case was terminated by voluntary dismissal without prejudice before an answer was served. *RFR Indus., Inc. v. Century Steps, Inc.*, 477 F.3d 1348 (Fed. Cir. 2007) (holding fees could not be awarded under Section 285, despite court order purporting to grant judgment on the pleadings, because plaintiff had dismissed action voluntarily before order was entered at a point when it had an absolute right to dismiss without prejudice and without court authorization).

---

[4]  Lack of success on some claims is, however, "taken into account [at the final step] when determining the amount of fees [to award] under § 285." *Beckman Instr., Inc., v. LKB Produkter, A.B.*, 892 F.2d 1547, 1554 (Fed. Cir. 1989).

### 2.    Exceptional Case

In addition to being the prevailing party, the moving party must establish that the case is "exceptional." *Highmark*, 687 F.3d at 1308. "A case may be deemed exceptional under Section 285 when there has been 'willful infringement, fraud or inequitable conduct in procuring the patent, misconduct during litigation, vexatious or unjustified litigation, conduct that violates Federal Rule of Civil Procedure 11, or like infractions.'" *MarcTec, LLC v. Johnson & Johnson*, 664 F.3d 907, 915-16 (Fed. Cir. 2012) (quoting *Serio-US Indus., Inc. v. Plastic Recovery Techs. Corp.*, 459 F.3d 1311, 1321-22 (Fed. Cir. 2006)).[5]  The Federal Circuit has also referred to the last grouping, "vexatious or unjustified litigation, conduct that violates [Rule 11], or like infractions[,]" collectively as the assertion of frivolous claims. *Highmark*, 687 F.3d at 1308.  In seeking fees under Section 285, Normark relies on an argument that Pure Fishing's claims were frivolous.

To prove a case is exceptional based on frivolousness, Normark must establish by clear and convincing evidence that the case was: (1) objectively baseless and (2) brought in subjective bad faith. *Highmark*, 687 F.3d at 1308-11; *MarcTec,* 664 F.3d at 916; *see also supra* n. 2.[6]  Unlike the

---

[5]  *MarcTec* and a number of other cases cited by the parties predate *Bard Peripheral Vascular, Inc. v. W.L. Gore & Assocs., Inc.*, 682 F.3d 1003, 1004-06 (Fed. Cir. 2012), which modified the standard of review applied to one prong of the test for frivolousness under Section 285. *Compare Highmark*, 687 F.3d at 1309 (noting that, after *Bard*, a district court's decision as to the "objective prong" of a determination that a case is frivolous is reviewed *de novo*), *with MarcTec*, 664 F.3d at 919 (applying a clear error standard of review to both the objective and subjective prongs). To the extent this court cites to or relies on any cases predating *Bard*, it takes this change in standard into consideration.

[6]  Without referring to either prong specifically, *MarcTec* noted that, where the alleged infringer prevails, "factors relevant to determining whether a case is exceptional include the closeness of the question, pre-filing investigation and discussions with the defendant, and litigation behavior. . . . Where a patentee prolongs litigation in bad faith, an exceptional finding may be warranted." *MarcTec*, 664 F.3d at 916 (internal quotation marks and citations omitted).

prevailing party determination, which looks at the case as a whole, the objective and subjective determinations are made on a claim-by-claim basis. *Highmark,* 687 F.3d at 1311.

### a.    Objective Baselessness

A claim is "objectively baseless" if the allegations are such "that no reasonable litigant could reasonably expect success on the merits." *Highmark,* 687 F.3d at 1309. The objective baselessness inquiry requires an objective assessment of the merits of the claim, without consideration of subjective intent. In determining whether a claim was objectively baseless, the court undertakes "a retrospective assessment of the merits of the entire litigation," looking back at the record developed throughout the case. *Highmark,* 687 F.3d at 1310 n.1. Ultimately, "[t]he question is simply whether the record established in the proceeding supports a reasonable argument as to the facts and law." *Id.*

Because the "objective prong is a single backwards-looking inquiry into the reasonableness of the claims in light of the full record[,]" a finding of objective baselessness may be made even where a case did not appear baseless at the time filed. *Highmark,* 687 F.3d at 1310-11 (rejecting argument "objective reasonableness standard applies only with respect to the initial filing . . . and does not apply to determinating whether . . . continued litigation of baseless claims was frivolous").

Unsuccessful pursuit of a claim, even a claim defeated on summary judgment, does not warrant an automatic finding that the claim was objectively baseless. *MarcTec*, 664 F.3d at 919 (affirming award of fees under Section 285 where proposed claim constructions necessary to success on merits were not merely unsuccessful but so lacking in evidentiary support that their assertion was both objectively baseless and reflected a lack of good faith).[7] In *Highmark*, for example, the court

---

[7] As noted above, *MarcTec*'s objective baselessness determination was affirmed applying a more deferential standard of review than would now be applied. The language used in the appellate opinion, however, suggests that the district court's finding on the objective prong would be affirmed under the current *de novo* standard.

affirmed a finding that the patentee's position as to one claim was objectively baseless but reversed a finding of objective baselessness as to another claim, where the failure of both claims resulted from the district court's adverse claim construction and resulting summary judgment rulings. The Federal Circuit affirmed the finding that the first claim was objectively baseless because the patentee offered "no plausible argument" in favor of a critical claim construction at any point in the litigation. *Id.* at 1312. The court found the other claim was not objectively baseless because the patentee's claim construction position as to that claim was not foreclosed by the claim language, specification, or file history, even though those sources favored the interpretation adopted by the district court. *Id.* at 1313-14.

### b.     Subjective Bad Faith

To demonstrate subjective bad faith, the moving party must show "that lack of objective foundation for the claim 'was either known or so obvious that it should have been known' by the party asserting the claim." *Highmark*, 687 F.3d at 1309 (quoting *In re Seagate Tech., LLC*, 497 F.3d 1360, 1371 (Fed. Cir. 2007) (*en banc*)).   In assessing the subjective prong, the court considers "the totality of circumstances." *Highmark*, 687 F.3d at 1311.  However, "[u]nlike the objective prong, which is a single retrospective look at the entire litigation, the subjective prong may suggest that a case initially brought in good faith may be continued in bad faith depending on developments during discovery and otherwise." *Id.* (citing *Computer Docking Station Corp. v. Dell, Inc.*, 519 F.3d 1366, 1379 (Fed. Cir. 2008)).

While a showing of specific wrongful intent will suffice to show subjective bad faith, it is not necessary. The moving party may also satisfy the subjective prong by showing recklessness or gross negligence. *Eltech Sys. Corp. v. PPG Indus., Inc.*, 903 F.2d 805, 811 (Fed. Cir. 1990).

Asserting and persisting in manifestly unreasonable positions may, therefore, warrant an inference of bad faith. *Id.*; *see also MarcTec*, 664 F.3d at 918 (noting "district court made several findings supporting its conclusion that MarcTec knew its allegations were baseless but pressed them anyway").

As recently confirmed in *Kilopass Tech., Inc., v. Sidense Corp.,* Slip. Op. No. 2013-1193 (Fed. Cir. Dec. 26, 2013), the subjective prong does not require proof of actual knowledge that a claim was baseless but, instead, requires the court to consider the totality of the circumstances. *Id.* at **13-22 (reversing order denying fees under Section 285 and remanding for further consideration where district court failed to address objective prong). *Kilopass* also clarified that an inference of subjective bad faith may be founded on "[o]bjective baselessness alone . . . *unless* the circumstances as a whole show a lack of recklessness on the patentee's part." *Id.* at *22 (emphasis added); *see also supra* n.2 (discussing *Kilopass*).

### 3.     Exercise of Discretion as to Award

If a prevailing party establishes that the case is exceptional under Section 285, then the district court determines, in its discretion, whether and to what extent to award attorney fees and expenses. *Highmark*, 687 F.3d at 1309; *MarcTec*, 664 F.3d at 915. The amount to be awarded "depends on the extent to which the case is exceptional." *Highmark*, 687 F.3d at 1309. In exercising its discretion, the court should consider that Section 285 serves the remedial "purpose of compensating the prevailing party for the costs it incurred in the prosecution or defense of a case where it would be grossly unjust, based on the baselessness of the suit . . . to require it to bear its own costs." *Highmark*, 687 F.3d at 1310 n.1.[8]

---

[8] Attorney fees and costs may be awarded to a prevailing party under Section 285 even if the parties' fees and costs were paid by a third party. *See, e.g., Automated Bus. Cos., Inc. v. NEC America, Inc.*, 202 F.3d 1353, 1356 (Fed. Cir. 2000) (noting that third-party payment of fees is not

### B.    Expert Witness Fees

In addition to an award of attorney fees and expenses under Section 285, the court may award expert witness fees pursuant to its inherent powers where the court finds a party has pursued a frivolous claim in bad faith. *MarcTec*, 664 F.3d at 921 (affirming award of expert witness fees); *iLor, LLC v. Google, Inc.*, 631 F.3d 1372, 1380 (Fed. Cir. 2011) (noting expert witness fees are allowable, but reversing award where there was no basis for finding bad faith pursuit of the claim). An award of expert witness fees is not, however, automatically justified by an exceptional case finding. *MarcTec*, 664 F.3d at 921 (noting district court should "explain why an award of attorney fees under § 285 is insufficient"). Expert fees may, for example, be warranted where "vexatious conduct and bad faith increased the cost of litigation in ways that are not compensated under § 285." *Id*. at 921-22.

## II.    RULE 11

Rule 11 provides that, by presenting a pleading, motion, or other paper to the court, an attorney certifies that he or she has performed "an inquiry reasonable under the circumstances" and that (1) the claims, defenses, and other legal contentions "are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law"; and (2) "the factual contentions have evidentiary support." Fed. R. Civ. P. 11(b)(2), (3). Under Rule 11, "presenting" includes "signing, filing, submitting, or later advocating" the position set out in a paper presented to the court. Fed. R. Civ. P. 11(b). The court may impose an appropriate sanction on any attorney,

---

relevant to the Section 285 inquiry). This is relevant to Normark's motions relating to the Cook Claims because the fees and expenses to defend this aspect of the lawsuit were paid by a third-party manufacturer, pursuant to a contractual agreement. Dkt. No. 364-7 ¶ 6 (Second Viet. Dec. re Cook Claims).

law firm, or party who violates Rule 11 or is responsible for a violation of the rule.  Fed. R. Civ. P. 11(c).

The Federal Circuit applies regional circuit law to Rule 11 motions.  *Raylon, LLC v. Complus Data Innovations, Inc.*, 700 F.3d 1361, 1367 (Fed. Cir. 2012); *Antonious v. Spalding & Evenflo Cos.*, 275 F.3d 1066, 1072 (Fed. Cir. 2002).  Thus, Fourth Circuit precedent controls application of the Rule 11 standard.[9]

The Fourth Circuit applies a standard of objective reasonableness to Rule 11 motions. *Morris v. Wachovia Sec., Inc.*, 448 F.3d 268, 277 (4th Cir. 2006).  A legal argument violates Rule 11(b)(2) when "in applying a standard of objective reasonableness, it can be said that a reasonable attorney in like circumstances could not have believed his actions to be legally justified." *Morris*, 448 F.3d at 277 (internal citations and quotation marks omitted).  Challenged legal arguments violate Rule 11 only if they have "absolutely no chance of success under the existing precedent." *Id*. Similarly, factual allegations violate Rule 11(b)(3) when they are "unsupported by *any* information obtained prior to filing." *Id*.  Thus, Rule 11's objective reasonableness standard is similar to the objectively baseless prong of the exceptional case standard under Section 285.  *See Raylon*, 700 F.3d at 1370 (describing standards as similar).

While deterrence is Rule 11's primary purpose, it also serves to compensate victims and punish litigation abuses.  *Brubaker v. City of Richmond*, 943 F.2d 1363, 1374 (4th Cir. 1991).  In light of these purposes, the court should  consider the following four factors in deciding the amount of any fee award under Rule 11:  (1) the reasonableness of attorney fees being sought; (2) the

---

[9]  While Fourth Circuit standards apply to the Rule 11 determination itself, Federal Circuit precedent remains significant because the reasonableness of Pure Fishing's legal arguments in this patent litigation depends on their potential for success under Federal Circuit precedent.

minimum amount necessary to deter; (3) the offending party's ability to pay; and (4) factors relating to the severity of the Rule 11 violation. *Brubaker*, 943 F.2d at 1374 (citing *In re Kunstler*, 914 F.2d 505, 523 (4th Cir. 1990)).

## DISCUSSION

### I.    PREVAILING PARTY

The court determines "prevailing party" status based on the litigation as a whole. *See, e.g.*, *Shum*, 629 F.3d at 1367 (noting there can be only one "winner" for purposes of an award of costs under Rule 54); *Brooks*, 393 F.3d at 1381 (noting prevailing party determination under Section 285 requires court to look to the "relation of the litigation result to the overall objective of the litigation," rather than the "count of the number of claims and defenses" on which each party was successful). In this case, Pure Fishing elected to pursue claims relating to two distinct patents, allegedly infringed by distinct categories of products, in a single action.[10]   Normark acquiesced in the joinder of the two distinct claims by failing to seek severance until after dismissal of the Kelley Claim.[11]   The court,

---

[10] As explained in the stipulation of dismissal of the Kelley Claim, the Kelley and Cook Patents are "directed to different technological arts[,]" with "the Cook Patent [being] directed to polyolefin fishing lines and methods for making such fishing lines[,]" and "the Kelley Patent [being] directed to "biodegradable recreational fishing lures."   Dkt. No. 123 ¶ 2. The stipulation also explains that the accused products are "mutually exclusive categories of Normark's products," which Pure Fishing alleged "infringe the Kelley Patent and the Cook Patent, respectively."   *Id.*

[11] Normark did not request any form of severance until after the Kelley Claim had been resolved by voluntary dismissal, at which point the matter had been pending for twenty-one months. Dkt. No. 1 (complaint filed August 16, 2010); Dkt. No. 137 (motion for entry of separate judgment filed May 14, 2012).  This request, which was denied, came in the form of a motion for entry of separate judgment under Rule 54(b) of the Federal Rules of Civil Procedure filed concurrently with Normark's reply in support of its first motion for attorney fees relating to the Kelley Claim.  Dkt. Nos. 136, 137 (arguing separate judgment was appropriate because "The Second Cause of Action is completely separate and distinct from the First Claim for Relief").

therefore, looks to the parties' relative success on *both* the Kelley and Cook Claims in determining whether Normark satisfies the threshold prevailing party requirement.[12]

Normark is clearly the prevailing party under this standard. As explained below, while it received some adverse rulings, Normark was entirely successful in defending against all of Pure Fishing's claims. Thus, Normark defeated the initial and primary objective of the litigation: Pure Fishing's pursuit of substantial monetary relief for infringement of the Cook and Kelley Patents. Normark was also successful in obtaining invalidity rulings with collateral benefits beyond this litigation with respect to the Cook Patent. As explained below, Normark's success in all respects was either the direct result of judicial rulings or, as conceded by the parties, the indirect result of the court's claim construction of the Kelley Patent.

**Kelley Claim.** Normark's success on the Kelley Claim was the direct result of a voluntary stipulation of dismissal with prejudice. Dkt. No. 123 (entered March 21, 2012). However, as the stipulation itself recites, dismissal was made necessary by the court's claim construction rulings. Dkt. No. 123 ¶ 7 (repeating Pure Fishing's disagreement with the court's claim construction, but conceding that "*the Claim Construction Order is a final disposition* of Pure Fishing's Second Cause of Action.") (emphasis added). Notably, the order became final only after substantial briefing on

---

[12] Although Pure Fishing acknowledges that "Federal Circuit precedent requires courts to review the litigation as a whole in resolving awards of fees and expenses," it argues that Normark cannot recover fees for the Kelley Claim because the court never issued a ruling on the merits *of that claim*. Dkt. No. 371 at 3 n.1, 6. This argument improperly conflates the threshold prevailing party determination, which looks to the case as a whole, with the claim-by-claim analysis applied to the exceptional case determination. *Compare Brooks*, 393 F.3d at 138 (prevailing party determination looks to relation of litigation result to overall objective), *with Highmark*, 687 F.3d at 1311 (exceptional case determination is made on a claim-by-claim basis).

claim construction and related matters, oral argument, initial ruling, and full briefing on and denial of Pure Fishing's motion to reconsider.[13]

Thus, even considering the Kelley Claim in isolation, its resolution followed and resulted from substantial litigation, was prompted by judicial rulings, and was with prejudice. These factors distinguish Normark's success on the Kelley Claim from the situation presented in *RFR Indus.*, 477 F.3d 1348, where the court held that voluntary dismissal of an action without prejudice and as of right (before defendant served its answer) could not support prevailing party status.

Further, while Normark's success on the Kelley Claim, viewed in isolation, was only the *indirect* result of judicial rulings, it presents circumstances similar to those found adequate to support a finding of prevailing party status in *Highway Equip.* and *Power Mosfet*. *See supra* at 3 (discussing both cases). In *Highway Equip.*, the court held that judicial dismissal of an action with prejudice based on plaintiff's execution of a covenant not to sue was sufficient to support prevailing party status. In reaching this conclusion, the court relied on *Power Mosfet*, in which the court held that

---

[13]  The disputed terms in the Kelley Patent were initially construed on November 9, 2011, after full briefing, court-requested supplemental submissions, resolution of related disputed motions, and oral argument. Dkt. Nos. 69, 73, 74, 79, 80, 83-86, 90-94. Pure Fishing promptly sought reconsideration of the construction of the Kelley Patent, arguing that the court's construction was erroneous because it introduced the ambiguous term "average" and because it relied on extrinsic evidence. Dkt. No. 97. On January 17, 2012, after full briefing, the court denied Pure Fishing's motion to reconsider noting, *inter alia*, that Pure Fishing's primary argument that inclusion of the term "average" created an ambiguity could have been but was not advanced prior to oral argument. Dkt. Nos. 115 at 3-5; *see also* Dkt. Nos. 97, 111, 113 (memoranda relating to motion). The extrinsic evidence argument was, likewise, rejected as belatedly made and non-persuasive. Dkt. No. 115 at 5-6. As the court noted, Pure Fishing had implicitly acknowledged the necessity for extrinsic evidence to aid the court in understanding "what a person of ordinary skill in the art meant when discussing the 'molecular weight' and 'degree of polymerization' of a 'long-chain polyhydroxy polymer'" by its "own listing of extrinsic evidence to be considered in construing the relevant term." Dkt. No. 115 at 6. The stipulation of dismissal of the Kelley Claim was filed two months after this ruling, on March 21, 2013. Dkt. No. 123.

a defendant that obtained dismissal of all claims against it through an order granting plaintiff's motion for voluntary dismissal with prejudice was the prevailing party. In so holding, the court stated that "dismissal of a claim with prejudice . . . is a judgment on the merits under the law of the Federal Circuit." *Power Mosfet*, 378 F.3d at 1396.

The only distinction between the dismissal of the Kelley Claim and the dismissal of the claims addressed in the relevant portion of *Power Mosfet* is that the dismissal in *Power Mosfet* was by order, granting plaintiff's unopposed motion for voluntary dismissal of one defendant with prejudice. Similarly, the dismissal in *Highway Equip.* was by judicial ruling based on plaintiff's voluntary execution of a covenant not to sue. Here, the dismissal was not by judicial ruling, but by joint stipulation of dismissal. The stipulation of dismissal, nonetheless, follows a judicial ruling which the stipulation itself characterizes as a "final disposition" of the Kelley Claim. Dkt. No. 123 ¶ 6 (quoted *infra* § II.A.1.).

In sum, it appears likely Normark would satisfy the prevailing party standard even if the Kelley Claim was viewed in isolation. The court need not, however, make such a determination given Normark's ultimate success on *all* claims against it and the relevant standard, which requires determination of prevailing party status based on the action as a whole.

**Cook Claims.** In connection with their cross-motions for summary judgment, the parties stipulated that Normark had literally infringed one or more claims of the Cook Patent on and before November 30, 2010, but had not done so after that period. Dkt. No. 217 (preserving Pure Fishing's right to challenge the court's denial of amendment to assert a claim for infringement under the doctrine of equivalents and Normark's right to assert affirmative defenses). Despite its admitted infringement, Normark avoided all liability as a result of its success on its affirmative defense of

14

invalidity. Dkt. No. 278 at 3 (summary judgment order invalidating the relevant claims of the Cook Patent on three grounds). The invalidity rulings provide additional relief beyond successful defense on Pure Fishing's infringement claims as Normark is now free to engage in what would otherwise have been prohibited infringing activity. *See Manildra Milling Corp. v. Ogilvie Mills, Inc.*, 76 F.3d 1178, 1182 (Fed. Cir. 1996) ("hold[ing] that as a matter of law, a party who has a competitor's patent declared invalid meets the definition of 'prevailing party'").

**Unsuccessful Counterclaim.** To the extent Normark failed to prevail on any substantive matter, it was on its counterclaim for inequitable conduct. Normark argued that the Cook Patent was unenforceable because of intentional, material misrepresentations or omissions made during prosecution of the patent. Dkt. No. 141 at ¶¶ 32-38 (describing misrepresentations as relating to Cook's claim of inventorship, the failure to disclose sales of Fireline Fused products more than a year before the filing date of the Cook Patent, statements regarding the Hogenboom patent, and failure to disclose other material information). The factual predicate for this counterclaim overlapped with Normark's successful affirmative defense of invalidity in that both required Normark to prove material misstatements or omissions in prosecution of the patent. Dkt. No. 141 ¶ 21. While Normark established this common element, it failed to establish by clear and convincing evidence that the misrepresentations and omissions were made with specific intent to deceive the Patent and Trademark Office ("PTO"). Dkt. No. 338 at 19-36, 37-45, 51-52 (findings of fact relating to intent), 53-58 (conclusions of law relating to intent).

**Conclusion as to Prevailing Party Status.** In sum, Normark was ultimately successful in defending all claims asserted against it based on the combined result of favorable claim construction, subsequent voluntary dismissal of one claim in light of the court's claim construction (Kelley

Claim), and summary judgment rulings (Cook Claims). It was, therefore, wholly successful in defeating the primary objective of the litigation. *See Brooks*, 393 F.3d at 1381 (focusing on primary objective of the litigation). Normark was unsuccessful only in failing to prevail on its inequitable conduct counterclaim due to its failure to prove intent to deceive the PTO by clear and convincing evidence. Therefore, considering the totality of the litigation, the court finds that Normark is the prevailing party.

## II.    EXCEPTIONAL CASE DETERMINATION

In seeking an exceptional case determination, Normark relies solely on arguments that the Kelley and Cook Claims were frivolous. The court, therefore, considers, on a claim-by-claim basis, whether Normark has established by clear and convincing evidence that these claims were both objectively baseless and pursued in subjective bad faith.[14]

### A.    Kelley Claim

#### 1.    Background

Although ultimately resolved by voluntary dismissal with prejudice, dismissal of the Kelley Claim was admittedly made necessary by the court's claim construction ruling as reflected in the stipulation of dismissal itself, critical portions of which are quoted below.

> 5.    Claims 1 and 9 of the Kelley Patent both recite a fishing lure "comprising at least one water-soluble long-chain polyhydroxy polymer with a molecular weight of at least 195,000 and a degree of polymerization of at least 2500." The Court construed the claim term to require that the fishing lure "contain at least one component that is a water-soluble long-chain polyhydroxy polymer, and that component have an average molecular weight of at least 195,000 and an average

---

[14]   While the court considers each prong separately as to the Kelley Claim and Cook Claims, it considers the two Cook Claims together. This reflects the limited distinctions between the two Cook Claims (the primary distinction being that the later-added claim was for willful infringement) and the parties' joint treatment of them in their memoranda.

16

degree of polymerization of at least 2500. 'Component' means an ingredient, not a single molecule within that ingredient." (Docket No. 94 at p. 1).

6. *Pure Fishing disagrees with the Court's claim construction, but acknowledges that Normark's accused products do not infringe the Kelley Patent under the Court's claim construction.* Specifically, [Pure Fishing] admits that Normark's Trigger X products do not have at least one water-soluble long-chain polymer with a molecular weight of at least 195,000 and a degree of polymerization of at least 2500", as that claim term has been construed by the Court.

7. *Accordingly, the Claim Construction Order is a final disposition of Pure Fishing's Second Cause of Action.* Pure Fishing and Normark hereby stipulate that Pure Fishing's Second Cause of Action is dismissed with prejudice.

Dkt. No. 123 (emphasis added).

Normark argues that Pure Fishing's underlying claim construction was objectively baseless and pursued in subjective bad faith, warranting an exceptional case finding. Most critically, Normark challenges what the court and parties have referred to as Pure Fishing's one-molecule or single-molecule theory of claim construction. Because the court's claim construction ruling, most critically its rejection of Pure Fishing's one-molecule theory, prompted the voluntary dismissal, the court summarizes the relevant claim-construction proceedings below.

**Pre-Construction Briefing.** In the Joint Claim Construction and Pre-Hearing Statement, Pure Fishing proposed the following construction of the disputed terms of Claims 1 and 9 of the Kelley Patent: "A fish lure that contains at least one component which is a water-soluble long-chain *molecule* with more than one hydroxyl group (OH) in which the sum of the molecular weights of the structural units in the *molecule* is at least 195,000." Dkt. No. 69-1 (emphasis added). The two references to "molecule" suggested Pure Fishing was arguing that the claim limitations would be met

17

if a single molecule within an accused fishing lure met the molecular weight ("MW") and related degree of polymerization ("DOP") limitations.[15]

In its opening brief in favor of this claim construction, Pure Fishing sought to distinguish its position from what it understood Normark's position to be, arguing as follows: "The difference between the parties' proposed constructions is simple – whether an infringing lure must contain one polymer with a molecular weight of at least 195,000, or whether the average molecular weight of all polymers in the lure must be at least 195,0000." Dkt. No. 74 at 10.[16] Because this argument referred to the "polymer" rather than a single "molecule," it left open whether Pure Fishing was, in fact, advancing the one-molecule theory.

In Pure Fishing's response to Normark's opening claim construction brief, Pure Fishing again sought to distinguish its proposed construction from Normark's, this time clearly disavowing the one-molecule theory that it characterized as a straw man:

> The correct question before the Court is not <u>whether *one molecule* in the lure must have the claimed properties or</u> whether an *average of all molecules* in the lure must have the claimed properties. Instead, the question before the Court is whether *one polymer component* in the lure must have the claimed properties or whether *all polymers* in the lure must have the claimed properties as an average. Both of Normark's proposed constructions require that all polymers in the lure have the claimed properties as an average. In contrast, Pure Fishing's proposed constructions require that just one polymer component in the lure have the claimed properties.

Dkt. No. 79 at 10-11 (underlined language later retracted, *see infra* at 19 discussing Dkt. No. 91-2).

--------------------------------

[15] As reflected in the stipulation of dismissal, the relevant claims of the Kelley Patent refer to the characteristics of the polymer used in the invention, not to a single "molecule" within that polymer. *See* Dkt. No. 123 ¶ 5 ("Claims 1 and 9 of the Kelley Patent both recite a fishing lure 'comprising at least one water-soluble long-chain polyhydroxy polymer with a molecular weight of at least 195,000 and a degree of polymerization of at least 2500.'").

[16] The court and parties have referred to the theory Pure Fishing ascribed to Normark as the "all-polymers theory."

In Normark's response to Pure Fishing's opening claim construction brief, Normark referred to Pure Fishing's characterization of Normark's claim construction as a misstatement of its position:

> Instead of articulating and defending its own claim construction position, Pure Fishing mischaracterizes Normark's position. Pure Fishing claims that Normark contends that "the average molecular weight of all polymers in the lure must be at least 195,000." Dkt. 74, p. 10 (emphasis in original). Pure Fishing characterizes Normark's position on the DOP limitation similarly. Id., p. 13.
>
> Pure Fishing is wrong. Normark has never claimed that "all polymers" in the lure must be aggregated and have the stated MW and DOP. To the contrary, and as explained in its opening brief, Normark contends that the MW and DOP limitations refer to the average MW and the average DOP of the water-soluble, long-chain polyhydroxy polymer material used to make the lure. If one such ingredient, for example a polyvinyl alcohol ("PVA"), has an average MW of "at least 195,000" and an average DOP of "at least 2500", then the claim limitation is met. Hypothetically, if a lure has two different water-soluble long-chain polyhydroxy polymers, one a PVA and the other a different polymer or a different PVA, and one of those two polyhydroxy polymers has an average MW of "at least 195,000" and an average DOP of "at least 2500" but the other does not, then again the claim limitation would be met.

Dkt. No. 80 at 2-3.

Thus, at this point in the proceedings, Pure Fishing had disavowed the one-molecule theory while Normark had disavowed the all-polymers theory. This left the court with the impression that the parties might, in fact, be in agreement as to this aspect of claim construction. The court, therefore, sought to confirm whether this was the case through informal, e-mail inquiry on November 2, 2011. *See* Dkt. No. 91-1, 91-2, 91-3 (attaching print-outs of email exchange).

Pure Fishing responded on November 3, 2011 as follows: "Pure Fishing . . . realizes that its 'disavowal' of the 'one molecule' theory is not correct. It apologizes for the confusion and additional work it has caused. The clause 'whether one molecule in the lure must have the claimed properties or' in Pure Fishing's reply brief should be considered deleted." Dkt. No. 91-2. Pure

19

Fishing then repeated its characterization of Normark's position as seeking to consider the "average MW [and DOP] of all polymers in the lure[,]" even though Normark had disavowed such a position. *Id.*

Pure Fishing also challenged inclusion of the word "average" through this response, arguing that "Normark's inclusion of the word 'average' in its proposed construction is not correct, because it ignores the essence of the invention as described by the patent." *Id.* Beyond this bald statement, which appeared to refer to the all-polymers theory Pure Fishing assumed Normark was making, Pure Fishing did not explain why use of the term "average" was inappropriate. Neither did it suggest any ambiguity regarding use of the term "average."[17]

This exchange left Pure Fishing's position unclear. In response to the court's email, Pure Fishing had retracted its disavowal of the one-molecule theory, asking the court to disregard one clause from its response to Normark's opening brief (Dkt. No. 79 at 10-11, quoted *supra* at 17-18). The language that remained suggested Pure Fishing agreed with a "one-polymer-component" theory, which is essentially the theory ultimately adopted by the court. On the other hand, Pure Fishing's proposed claim construction still included the word "molecule" and its retraction of its earlier disavowal suggested it was, again, pursuing the one molecule theory.

The court, therefore, sought clarification of Pure Fishing's position though a docket text order that posed three specific questions. Dkt. No. 84. Pure Fishing's response, which incorporated the court's questions, was as follows:

---

[17] The issue of ambiguity of the term "average" is significant because it was raised for the first time at oral argument and again on motion for reconsideration of the claim construction ruling.

      **1.**      **Does Plaintiff agree that molecules of a polymer component of the type covered by claims 1 and 9 would vary in length and, consequently, vary in molecular weight (MW) and degree of polymerization (DOP)?**

      Yes.

      **2.**      **Does Plaintiff maintain that a person skilled in the art WOULD understand that a reference to a polymer component with a "minimum" MW and DOP refers to a polymer component in which at least one of the molecules within the polymer component met the minimum?**

      Yes, Pure Fishing maintains that one skilled in the art would, upon reading this patent, which is the proper consideration here, understand that a reference to a polymer component with a "minimum" MW and DOP refers to a polymer component in which *at least one of the molecules within the polymer component* met the minimum.

      **3.**      **Does Plaintiff maintain that a person skilled in the art would NOT understand that a reference to a polymer component with a "minimum" MW and DOP refers to a polymer component in which the average MW and DOP of the molecules within a given sample met the minimum?**

      Yes, Pure Fishing maintains one skilled in the art would, upon reading this patent, not understand that a reference to a polymer component with a "minimum" MW and DOP refers to a polymer component in which the average MW and DOP of the molecules within a given sample met the minimum.

Dkt. No. 86 (emphasis added).[18]

---

    [18] Through this same document, filed three business days before the scheduled November 9, 2011 claim construction hearing, Pure Fishing sought to offer a previously unnamed expert witness. *See* Dkt. No. 86 at 1-2 (November 4, 2011 response to court's inquiries asserting that Pure Fishing had "properly and timely disclosed this witness because he was identified in response to the court's post-briefing inquiries to the parties and he was "disclosed and an expert report by him is being served on Normark today."); *see also* Dkt. No. 91 at 6 (Pure Fishing's motion to reconsider suggesting impropriety in Normark's November 4, 2011 motion to bar this expert because Normark "did not tell the Court what the subject matter of the proposed testimony was, as it did not know itself" as of that date).

The court granted Normark's motion to bar this witness given that the deadline for naming expert witnesses on claim construction expired in July 2011, and Pure Fishing did not seek to name the witness until three days before the claim construction hearing. Dkt. No. 90 at 1 (order barring witness); Dkt. No. 91-4 (November 4, 2011 email to Normark's counsel identifying the witness for the first time and suggesting that he would be made available for deposition in North Carolina on Sunday or Monday afternoon). The court denied Pure Fishing's motion to reconsider this order by oral ruling during the November 9, 2011 claim construction hearing. Dkt. Nos. 91, 92.

Pure Fishing's response to the second question confirmed that it had reclaimed the one-molecule theory.  At oral argument, Pure Fishing's attorney stated:

> If you read the patent accurately and understand what Pure Fishing did here, they found a super duper ingredient.  *They claim one molecule, if you will* – we originally didn't think there was any claim construction necessary and we had to come up with one because Normark had one.
>
> * * *
>
> Now, the intrinsic evidence that supports this . . . [is] the description of the specification that makes very clear all you need is a little bit of this magic stuff.
>
> * * *
>
> This is all about very little bits of the stuff comprising – in the abstract it says, comprises at least one water-soluble long chain polymer.  Then at the bottom of column two it can be as low as one weight percent.
>
> . . . So in this . . . whole lure, *this magic ingredient can be as low as one weight percent*. . . . The magic ingredient is very small *and the percentage of super duper within the magic ingredient can be even smaller*.
>
> * * *
>
> We really thought [it] couldn't be clearer that this claim calls for a little tiny bit of this ingredient.  You've called it one polymer or *one molecule.  I think that's a good way to look at it, and your e-mails did kind of force us to focus and get to that point.*

Dkt. No. 96 at 16-18 (transcript of Nov. 9, 2011 hearing) (emphasis added).  In his concluding argument, Pure Fishing's counsel again referred to the "super duper ingredient" being "but one part of the PVA" material used to make the lure.  *Id.* at 38 ( confirming that the "super duper ingredient" and PVA, of which it was a part, were "all the same polymer ingredient" and that only some of this ingredient "has to meet the claim limitations").  He also repeated that  "*[a]t least one could be one molecule.*" *Id.* at 39 (referring to the claim limitation that the lure comprises "*at least one* water–soluble long-chain polyhydroxy polymer with" specified minimum MW and DOP values (emphasis added)).

22

**Claim Construction Order.** Following oral argument on November 9, 2011, the court construed the disputed claim term to require that the fishing lure "contain at least one *component* that is a water-soluble long-chain polyhydroxy polymer, and that that component have an average molecular weight of at least 195,000 and an average degree of polymerization of at least 2500. *'Component' means an ingredient, not a single molecule within that ingredient*." Dkt. No. 94 at 1 (emphasis added).

This construction rejected both the one-molecule theory and the all-polymers theory. It also reflected the unique characteristics of long-chain polymers which, unlike simple compounds, consist of molecules with varying lengths and, consequently, varying MW and DOP. *See* Dkt. No. 86 (Pure Fishing's November 3, 2011 response to docket text order agreeing that "molecules of a polymer component of the type covered by claims 1 and 9 . . . vary in length and, consequently, vary in molecular weight (MW) and degree of polymerization (DOP)"); *see also* Dkt. No. 74 at 16 (Pure Fishing's opening claim construction brief defining polymer).[19] The need to measure MW and DOP of such polymers based on some "average" of a given sample is supported not only by their unique nature (molecules of varying lengths) and an extrinsic source (expert report) submitted by Normark, but also by at least one extrinsic source on which Pure Fishing relied in its opening claim-

---

[19] As explained in Pure Fishing's opening claim construction brief:

> a "polymer" is defined as a "substance made of giant molecules formed by the union of simple molecules (monomers)." <u>McGraw-Hill Dictionary of Scientific and Technical Terms</u>, 6th ed, 2003, pg. 1635. Each giant molecule, also known as a long-chain molecule, is formed from a chain of structural units. Each structural unit contributes to the molecular weight of the long-chain molecule. Consequently, the "molecular weight" of a long-chain molecule is "the sum of the atomic weights of all the atoms in a molecule," which is akin to "the sum of the molecular weights of the structural units in the molecule" as proposed by Pure Fishing. *Id.* at 1365.

Dkt. No. 74 at 16.

construction memorandum. *See* Dkt. No. 74 at 14 (quoting McGraw-Hill Dictionary of Scientific

and Technical Terms, 6th ed, 2003, pg. 566 ("'degree of polymerization' is defined as 'the number

of structural units in the *average* polymer molecule in a particular sample.'") (emphasis added).

**Motion to Reconsider.**  After the court construed the claim, Pure Fishing retained new

counsel and then, on November 21, 2011, sought reconsideration of the claim construction order.

Pure Fishing argued that the court erred in including the term "average" in its claim construction

because the term introduced ambiguity (and a possible argument that the claim was invalid for

indefiniteness) and the court improperly relied on extrinsic evidence. Dkt. No. 97.[20]

Although Pure Fishing focused on these two issues, it acknowledged its prior pursuit of the

one-molecule theory, and ostensibly continued to advance that theory, as follows:

> At the Markman hearing on November 9, 2011, after the extensive communication
> with the Court, and extensive negotiation between the parties as to their respective
> positions, the issue of the proper construction here crystallized to that single
> issue—whether or not the word "average" should be included in the constructions of
> molecular weight and degree of polymerization. *Pure Fishing's position was, and
> is, that the disputed term requires that "at least one molecule have a molecular
> weight of at least 195,000 and a degree of polymerization of 2500."*

Dkt. No. 97 at 3 (emphasis added) (footnote omitted).[21]

Despite this reaffirmation of its reliance on the one-molecule theory, Pure Fishing did not

mention the one-molecule theory again except in a single sentence in its argument that the court

---

[20]  The argument section of Pure Fishing's combined motion and memorandum includes the
following three headings:  "A.  Legal Standard for Reconsideration"; "B.  An Ambiguous
Construction, Which Renders a Claim Invalid, is the Wrong Construction as a Matter of Law"; and
"C.  The Court Improperly Relied on Extrinsic Evidence[.]"

[21]  This characterization of the issue at the time of oral argument as limited to the "single
issue [of] whether or not the word 'average' should be included" ignores Pure Fishing's continued
pursuit of the one-molecule theory, which is repeated in this paragraph of its motion for
reconsideration.

improperly relied on extrinsic evidence. This sentence follows a discussion of six excerpts from the Kelley Patent (discussed below) and reads as follows: "This intrinsic evidence confirms Pure Fishing's construction that '*at least one molecule* have a molecular weight of at least 195,000 and a degree of polymerization of 2500' and the word 'average' is not there." Dkt. No. 97 at 9. (emphasis added).

The first three excerpts were from claims in the Kelley Patent, each of which requires that the lure contain "**at least one** water-soluble long-chain polyhydroxy *polymer*" meeting the MW and DOP limitations. Dkt. No. 97 at 8 (bold emphasis in original, emphasis in italics added). The remaining three excerpts were from other sections of the patent (*e.g.*, summary or detailed description). These excerpts: (1) indicated the limiting polymer could be as little as 1% of the composition of the lure; (2) noted the invention's ability to "address the necessary properties required of a soft fishing lure," stated that the intended performance could be achieved using a "PVA based product" if a "significant portion of the material" meets the specified MW and DOP limitations, and explained that "the 'long-chain polymer' referred to in the claims 'refers to network and linear polyhydroxy polymers'" with the specified minimum MW and DOP; and (3) listed several types of polymer which might be used including Amorphophallus Knjac and polyvinyl alcohol ("PVA"), and stated that this material will generally make up "from about 1wt % to about 2 wt% of the total composition" of the lure. Dkt. No. 97 at 8-9.

Pure Fishing did not explain how these excerpts from the Kelley Patent "confirm[ed] Pure Fishing's construction that 'at least one molecule'" must meet the MW and DOP limitations. Certainly, none of the excerpts used the word "molecule." Instead, each referred to a "polymer" or "material." Some also referred to the polymer making up one percent or a "significant portion of

25

the [polymer] material." Thus, Pure Fishing's argument appeared to rest on the implicit assumptions that the phrases "at least one . . . *polymer*" and "at least one *molecule*" are equivalent and that a single molecule could make up at least one percent or a "significant portion" of the lure. Neither of these assumptions is, however, readily apparent or supported by argument or evidence.

The remainder of Pure Fishing's arguments in favor of reconsideration challenged inclusion of the word "average" in the court's construction of the MW and DOP limitations. Consistent with this focus, Pure Fishing concluded by arguing that the court should eliminate the word "average" from its construction. *Id.* at 9. Pure Fishing did not, however, suggest the addition of the word "molecule," as it had in its earlier proposed construction.

**Normark's Opposition**. Normark opposed the motion for reconsideration on both procedural and substantive grounds. Dkt. No. 111. In its procedural argument, Normark noted that Pure Fishing had either previously raised or could have raised the arguments advanced on reconsideration. *Id.* at 4 (noting Pure Fishing did argue at the hearing that "failure to specify a *particular* average raised a validity concern") (emphasis added). Substantively, Normark argued that if use of the term "average" rendered the patent ambiguous, the difficulty was in the patent itself, not the court's construction. *Id.* at 6 (noting both that Pure Fishing did not concede indefiniteness and that whether any ambiguity in the average to be used made the patent ambiguous was subject to debate); *id.* at 7 n.3 (asserting that the accused products did not infringe under any commonly-used methods for determining average MW and DOP). Normark further argued that the claim construction was correct, even if it invalidated the patent, because Pure Fishing's "single molecule construction is clearly wrong." *Id.* at 9; *id.* at 10 (noting both parties had submitted several scientific

texts, all of which made clear that "use of a single number for MW and DOP necessarily refers to an average, and not to a single molecule").

**Pure Fishing's Reply**.  On reply, Pure Fishing repeated its position that the court's construction of the disputed claim language "constitutes an incomplete and incorrect construction of the claims[,]" largely because the court incorporated the ambiguous term "average." Dkt. No. 113 at 1.  As to procedural issues, Pure Fishing argued that reconsideration would conserve judicial resources because the prior ruling failed to specify "which _kind_ of average" should be used.  However, instead of suggesting which kind of average should be used, Pure Fishing argued as follows:

> Accordingly, to resolve finally the claim construction issue and avoid further expenditure of judicial resources, the Court should grant this motion and adopt Pure Fishing's construction or construe the claims to require a sufficient quantity of the long-chain polyhydroxy polymers described in claims 1 and 9 to create the desired characteristics.  Both of these constructions would require no further judicial action.

Dkt. No. 113 at 2.[22]

It is not entirely clear whether the reference to "Pure Fishing's construction" referred to Pure Fishing's originally advanced one-molecule theory or to removal of the word "average" as suggested in the conclusion to Pure Fishing's opening memorandum.  The majority of Pure Fishing's reply, however, suggested the latter (removal of the word average).  These arguments addressed (1)

---

[22] In a footnote, Pure Fishing sought alternative relief in the event of denial of its motion for reconsideration.  Specifically it asked that the court "permit the parties to engage in limited discovery and brief for the Court the issue of which method of determining the 'average' should be used to determine infringement." _Id._ at 3 n. 1.  The order denying the motion for reconsideration noted that the court's construction might "leave[] open which method of determining averages should be used." Dkt. No. 115 at 5.  It further noted, however, that it was "possible, as Normark argues, that the accused products do not meet the claim limitations regardless of which method of determining averages is used.  If so, neither the jury nor this court will need to choose between the possible methods of determining averages." _Id._ n.4.

problems caused by the claimed ambiguity in inclusion of the word "average," (2) legal principles

favoring construction to preserve validity, and (3) impropriety in the court's reliance on extrinsic

evidence in incorporating the word "average." *Id.* at 2-6. A fourth argument, which addressed an

alleged inconsistency between the court's construction and the "invention as Described and Claimed

in the Kelley Patent[,]" may refer to the one-molecule theory, or at least to an argument in favor of

some minimum number of molecules meeting the MW and DOP limitations. *Id.* at 6 (arguing that

"even a very small number of molecules meeting the thresholds in claims 1 and 9 are sufficient to

cause the desirable characteristics described in the patent.").[23]

> Pure Fishing concluded its reply as follows:
>
> The Court should reconsider its order and replace it with an order adopting Pure Fishing's construction or construing claims 1 and 9 of the Kelley Patent to require a sufficient number of the long-chain polyhydroxy *molecules* described in claim 1 and 9 to create the *desired characteristics*. These constructions are consistent with the clear terms of the Kelley Patent, do not rely on extrinsic evidence, and do not require any further judicial action.

*Id.* at 7 (emphasis added).[24]

---

[23] It is not entirely clear what Pure Fishing is referring to as the "desirable characteristics" of the claimed invention. The claims themselves refer to biodegradability, ability to release fish attractant and "a Shore 00 durometer reading of from 0 to 50." *See* Dkt. No. 1-2 (Kelley Patent) at col. 12 lines 44-46 (claim 1) & col. 13 lines 7-9 (claim 9). These characteristics have not, however, been read out of the claims by the court's construction. There is no preamble which might import additional characteristics into the claims. The summary of the invention does, however, suggest that lures made according to the invention would be "soft and . . . exhibit superior durability, tensile strength, flexibility, elasticity, cohesive strength, aesthetic appeal, and low cost." *Id.* at col. 2 lines15-17. To the extent Pure Fishing is relying on this description, it has not explained why these generally described characteristics should be read into the claim limitations or, more critically, why the court's construction is inconsistent with the described characteristics.

[24] Pure Fishing had not previously sought construction to require a "sufficient number" of molecules to "create the desired characteristics." As discussed above, however, it has shifted its claim construction position repeatedly, first appearing to assert, then disavowing, then reclaiming the one-molecule theory (prior to the court's initial claim construction ruling). In seeking reconsideration, Pure Fishing initially appeared to reassert the one-molecule theory, though its

**Denial of Motion for Reconsideration**.  The court denied Pure Fishing's motion for reconsideration. Dkt. No. 115.  As explained in the order, Pure Fishing did not raise its concern with ambiguity of the term "average" prior to oral argument.  It had, instead, challenged inclusion of the term "average" in contexts that suggested its objection related to averaging the MW and DOP of *all polymers in the lure* if more than one was used.  *See* Dkt. No. 115 at 4.  The order also noted that some of Pure Fishing's written arguments and cited treatises submitted prior to claim construction suggested some form of average must be used to determine a polymer *component's* molecular weight and degree of polymerization.  *See* Dkt. No. 115 at 4-5.

Pure Fishing's argument relating to extrinsic evidence was, likewise, deemed untimely and non-persuasive.  *Id.* at 5-6.  Other arguments raised for the first time in Pure Fishing's reply in support of reconsideration or, at earliest, in response to the court's pre-argument request for clarification (*e.g.*, that the court's construction was somehow inconsistent with the invention) were also rejected, as was a newly offered construction of the claim to include "a sufficient number of the long-chain polyhydroxy molecules described in claim 1 and 9 to create the desired characteristics" of the invention. Dkt. No. 115 at 6-7; Dkt. No. 113 at 7 (Pure Fishing's reply, quoted *supra*).

**Stipulation of Dismissal.**  After the court denied Pure Fishing's motion for reconsideration, the parties stipulated to dismiss the Kelley Claim with prejudice.  Critically, the stipulation of

─────────────

primary argument and conclusion challenged only the inclusion of the word "average."  Its reply in support of reconsideration alternatively seeks to replace the court's construction with "Pure Fishing's construction" (without specifying whether it refers to the one-molecule theory or simply removal of the word "average" from the court's construction) or a newly proposed construction "to require a *sufficient quantity* of long-chain polyhydroxy *polymers* described in claims 1 and 9 to create the desire characteristics."  Dkt. No. 113 at 2.  Later in its reply, Pure Fishing reintroduces the "molecule" concept, albeit in plural, seeking construction "to require a *sufficient number* of the long-chain polyhydroxy *molecules* described in claims 1 and 9 to create the desired characteristics." *Id.* at 7.

dismissal "acknowledg[ed] that Normark's accused products *do not infringe* the Kelley Patent *under the Court's claim construction*" and that the *"Claim Construction Order is a final disposition"* of the Kelley Claim.    Dkt. No 123 ¶¶ 6, 7 (emphasis added).[25]

**First Motion for Attorney Fees.**  Normark moved for an award of fees under Section 285 following the stipulated dismissal of the Kelley Claims.  Dkt. No. 126.  After full briefing, the court determined that the issue could not properly be resolved prior to resolution of the remaining claims and, therefore, denied the motion with leave to renew "after the conclusion of proceedings as to the remaining claims."  Dkt. No. 153.

**Current Motion for Attorney Fees.**  In its renewed motion for fees relating to the Kelley Claim, Normark argues that Pure Fishing's claim construction position–specifically, its "one-molecule theory"–was objectively baseless and pursued in subjective bad faith, thus warranting fees under Section 285.

**Response in Opposition to Motion for Attorney Fees.**  Pure Fishing responds that its *overall pursuit of the Kelley Claim* was subjectively and objectively reasonable because:  (1) the accused lures exhibited many of the same characteristics as lures made in accordance with the Kelley Patent; (2) pre-suit testing showed that 3% of the molecules in the accused lures had the requisite molecular weight and degree of polymerization; and (3) "it is not unusual for the lures to which the Kelley Patent is directed to be comprised of more than one grade of PVA[,]" which "confirmed that Normark was using a grade of PVA, perhaps in conjunction with a lower grade of PVA, containing

_____

[25] The concession that Normark's products *do not infringe* under the court's claim construction suggests that the result would be the same regardless of the particular method of determining average MW and DOP of any polymer(s) used in the accused lures.  Thus, while inclusion of the word "average" may have presented a theoretical ambiguity, it was not an ambiguity that required resolution in this action.

a large number of very long chain molecules." Dkt. No. 371 at 8.  Pure Fishing also included the

following argument:

> Pure Fishing is unaware to this very day of any evidence that proves for sure
> that Normark's foreign manufacturer is ***not*** using such a combination of grades of
> PVA, which would infringe the Kelley Patent, to make the [accused] lures.  In short,
> it has never been shown that Normark, in fact, is not infringing the Kelley Patent.  In
> light of the difficulty of proving Normark's overseas manufacturer used such a
> combination of grades of PVA, however, and in light of the limited sales of the
> Trigger X lures, Pure Fishing decided to voluntarily dismiss its claim.  Pure Fishing
> had a good faith basis to bring this lawsuit and Normark has not and cannot show
> otherwise.

Dkt. No. 371 at 9; *see also id.* at 10 ("The use of two grades of PVA, however, renders *proving* the

use (by an overseas supplier) of a PVA 'component' meeting the claim extremely difficult.").

These arguments are notable for three reasons.  First, they do not directly address the

reasonableness of the one-molecule theory of claim construction (or Pure Fishing's other

subsequently proffered alternative constructions).  Second, they suggest that Pure Fishing brought

the Kelley Claim believing Normark was using two grades of PVA in the accused lures, at least one

of which met the MW and DOP limitations.  Third, they suggest Pure Fishing dismissed the action

due to the difficulty of proving that Normark was using a blend of PVAs, one or more of which met

the relevant claim limitations (minimum MW and DOP).

The first point is significant because it demonstrates a continued failure to offer any plausible

support for the one-molecule theory.  The second is significant because it suggests Pure Fishing was

proceeding based on the claim construction adopted by the court, rather than the one-molecule theory

(or any of its subsequently advanced alternative constructions) .  The third is significant for the same

reason and because of its inconsistency with the stipulation of dismissal, which acknowledged that

Normark *was not infringing under the court's claim construction* rather than relying on any difficulty of proof.

As to its prior objection to inclusion of the word "average" in the claim construction, Pure Fishing argues as follows:

> Pure Fishing opposed the inclusion of the word "average" in the claims because adding an "average" limitation *makes the claims inconsistent with what the inventor intended to be claimed.* Put simply, the lure claimed in the Kelley Patent is comprised generally of a larger number of very long chain PVA *molecules* than the lures that came before it.

Dkt. No. 371 at 10.

This argument is notable for several reasons. First, the challenge to inclusion of the word "average" is recast as having been based on some inconsistency with what the inventor intended rather than on ambiguity as to which form of average would be used. Second, the nature of the inconsistency between the court's construction and the inventor's intent is not specified unless it is explained by the statement that the Kelley Patent claimed lures "comprised generally of a larger number of very long chain PVA molecules than the lures that came before it." Such a construction has not been previously proposed and, in any event, would likely be impossible to apply in practice even assuming the inventor's subjective intent might provide a valid basis for claim construction.[26]

Finally, Pure Fishing relies on the complexity of the issue, as evidenced by the court's request for supplemental briefing, as evidence that its position was not objectively baseless. *Id.* ("Although the claim language may appear simple, the substantial efforts by the Court show that this was a complicated issue."). This argument mischaracterizes the source of the court's greatest

---

[26] To the extent Pure Fishing may be relying on "inconsistency" between the invention and the all-polymers theory, which it repeatedly ascribed to Normark despite Normark's disavowals of reliance on such a theory, its argument fails because the court's construction precludes reliance on such a theory.

difficulties and request for clarification, which arose not from the complexity of the issues themselves, but from Pure Fishing's shifting claim construction positions and failure to offer plausible argument in support of those positions.

### 2. Objective Prong

Assessing the objective prong of the frivolousness determination requires the court to undertake a "retrospective assessment of the merits of the entire litigation" based on the "record established in the proceeding[,]" albeit on a claim-by-claim basis. *Highmark*, 687 F.3d at 1309. In the context of the Kelley Claim, this requires the court to focus on Pure Fishing's pre-dismissal claim-construction positions, given that the stipulation of dismissal conceded Normark's products "do not infringe . . . under the Court's claim construction" and that the "Claim Construction Order is a final disposition" of the Kelley Claim. Dkt. No. 123 ¶¶ 6, 7.

Critically, the stipulation of dismissal does not rely on *difficulty of proof* under the court's construction, as suggested in Pure Fishing's opposition to Normark's present motion. Neither does it rely on any ambiguity in the particular method of determining "average" MW and DOP of a polymer, which was the focus of Pure Fishing's pre-dismissal arguments in support of reconsideration of the court's claim construction. It, instead, concedes that Normark was not infringing under the court's construction, which rejected both Pure Fishing's one-molecule theory and the all-polymers theory Pure Fishing ascribed to Normark.

Under these circumstances, with the benefit of the full record, the court concludes that Pure Fishing's success on the Kelley Claim was dependent on its success in its proffered one-molecule theory of claim construction. The question, therefore, becomes whether a "reasonable litigant could reasonably expect success on the merits" of such an argument. *See Highmark*, 687 F.3d at 1309.

33

As summarized above, Pure Fishing's claim construction arguments initially focused on defeating what it believed to be Normark's position: that the MW and DOP values to be considered were the average of all polymers in a lure if multiple polymers were used (the all-polymers theory). While Pure Fishing included the word "molecule" twice in its proposed claim construction, it was not entirely clear from Pure Fishing's initial memorandum whether it was advancing the one-molecule theory. Indeed, in its responsive brief, Pure Fishing disavowed reliance on any such theory. Dkt. No. 79 at 10-11. Only after the court drew the parties' apparent agreement on claim construction to their attention and sought clarification did Pure Fishing unequivocally assert the one-molecule theory.

Pure Fishing did not, however, advance any plausible argument in support of construing the relevant claim language to cover any polymer that contained even a single molecule meeting the specified MW and DOP at that time (or in its earlier memoranda). Neither did it proffer such an argument on motion to reconsider, instead arguing that the court's construction was improper because it introduced an ambiguity into the construction and relied on extrinsic evidence. On reply in support of reconsideration, Pure Fishing argued the court's construction was also "inconsistent with the invention" and proffered a new alternative construction "to require a sufficient number of the long-chain polyhydroxy molecules described in claim 1 and 9 to create the desired characteristics." Pure Fishing, however, still failed to advance any plausible argument in support of the one-molecule theory. Dkt. No. 113 at 7.

Even now, Pure Fishing offers no plausible argument in favor of the one-molecule theory of claim construction. To the contrary, its current arguments suggest it (1) advanced the Kelley Claim based on a construction essentially the same as that adopted by the court (one which rejects both the

34

one-molecule and the all-polymers theories), but (2) dismissed the Kelley Claim due to difficulties of proving whether Normark was using a blend of polymer components, at least one of which met the MW and DOP limitations. The first of these arguments is inconsistent with Pure Fishing's pursuit of the one-molecule theory. The second is inconsistent with the reason stated for the dismissal in the stipulation: that Normark *was not infringing* under the court's construction.

Pure Fishing's other arguments in opposition to Normark's motion for fees relating to the Kelley Claim either suggest new alternative constructions or continued challenge to inclusion of the term "average" in the court's construction. Even if these arguments were adequately supported, and they are not for reasons explained above, they would not support the one-molecule theory on which Pure Fishing relied prior to stipulating to dismissal of the Kelley Claim with prejudice.

In sum, Pure Fishing has failed, at any point in the litigation, to proffer support for its one-molecule theory. The express language of the stipulation of dismissal of the Kelley Claim confirms that the court's claim construction, specifically the rejection of the one-molecule theory, was fatal to the Kelley Claim. It follows that there is clear and convincing evidence that Pure Fishing's pursuit of the Kelley Claim was objectively baseless in light of the full record.

### 3. Subjective Prong

The court next considers whether the litigation was pursued in subjective bad faith. As explained in *Highmark*, subjective bad faith requires consideration of the totality of circumstances, and requires proof that the lack of an objective foundation was either known or so obvious that it should have been known. *Highmark*, 687 F.3d. at 1309. More recently, *Kilopass* clarified that a party may satisfy its burden as to this prong based on "[o]bjective baselessness alone . . . unless the circumstances as a whole show a lack of recklessness." *Kilopass*, 2013 WL 680085 *11. Unlike

35

the objective prong, this prong allows consideration of changing circumstances during the course of the proceeding. *Highmark*, 687 F.3d at 1390 (noting that "a case initially brought in good faith may be continued in bad faith depending on developments during discovery and otherwise.").

The court does not find subjective bad faith from the outset. Prior to the time the parties filed their claim construction memoranda, it was unclear whether Normark was relying on the all-polymers theory of claim construction (*i.e.*, that the MW and DOP limitations referred to the average of all polymers used in a lure). Only after the responsive briefs in support of claim construction were filed and the court sought clarification was it clear that Normark had disavowed the all-polymers theory, effectively confirming that it was not seeking a ruling that could avoid infringement by using a blend of polymers which, collectively, had average MW and DOP below the specified limitations. To this point, Pure Fishing's opposition to what it understood Normark's construction to be was not unreasonable. It was also only at and after this point that Pure Fishing reclaimed (or arguably clearly claimed in the first instance) the one-molecule theory.

Based on this evidence, the court finds that, prior to November 3, 2011, the totality of circumstances show that Pure Fishing was not reckless in pursuing the Kelley Claim and advancing its related claim construction (*Kilopass* standard). The court further finds that, before November 3, 2011, the evidence is insufficient to show that Pure Fishing knew or should have known that there was no objective foundation for the Kelley Claim (*Highmark* standard). The court reaches this conclusion under either a clear and convincing or preponderance of the evidence standard.

No later than November 3, 2011, however, it should have been obvious to Pure Fishing not only that it *was* relying on the one-molecule theory of claim construction, but also that its success on the merits of the Kelley Claim was dependent on this construction. This is evidenced both by

Pure Fishing's express statements in its pre-hearing responses to the court's requests for clarification and through oral argument.  It is confirmed by Pure Fishing's subsequent concession in the stipulation of dismissal that Normark *was not infringing* under the court's construction.  Given what Pure Fishing would have understood at this time regarding Normark's position, and its failure, even now, to proffer a plausible argument in support of the one-molecule theory, the court finds, by clear and convincing evidence, that Pure Fishing's pursuit of the Kelley Claim was in subjective bad faith from November 3, 2011, when it reclaimed the one-molecule theory though its email response, through January 17, 2011, when the court denied Pure Fishing's motion for reconsideration, which continued to advance the one-molecule theory (and other alternative theories for which no plausible support has been proffered).  Dkt. Nos. 86, 115.[27]

### 4.    Award of Fees.

Normark seeks the following fees and expenses relating to the Kelley Claim: (1) $281,160.63 in attorney fees and expenses for defense of the merits; (2) $24,371 for expert fees; (3) $62,408.57 for attorney fees and expenses in bringing its first motion for attorney fees; and (4) $2,913.50 for bringing its renewed motion for attorney fees.   For the reasons set forth below, the court awards Normark a total of $77,562.75 in fees relating to the Kelley Claim.  The court declines to award expert witness fees or other expenses.[28]

**Attorney Fees**.  Because the court has found Pure Fishing's pursuit of the Kelley Claim subjectively baseless only for a limited period of time, it limits its award of attorney fees for defense

---

[27]  This finding, based on clear and convincing evidence, necessarily includes a finding that the same standard would be met under a lower, preponderance of the evidence, standard.

[28]  The parties have, by stipulation, agreed to costs to be paid under Rule 54.  This order addresses only expenses beyond those allowable under Rule 54.

of the merits to the same period: November 3, 2011, through January 17, 2012. Normark's attorney fees during this period total $59,662.75. The court awards these fees for Normark's defense of the merits.[29]

Because the court has not awarded the full attorney fees sought for defense of the merits, it declines to award the full amount sought for pursuit of Normark's two motions for attorney fees and expenses. Balancing the degree of Normark's ultimate success in obtaining attorney fees and the work which would have been necessary had Normark pursued only one motion limited to the fees ultimately awarded, the court finds that an award of roughly 30% of the award of attorney fees for defense of the merits is appropriate. The court, therefore, awards $17,900 in attorney fees for Normark's pursuit of its related motions for attorney fees.

**Expenses.** The court declines to award any expenses for either defense of the merits or pursuit of the fee award under Section 285 because it does not find an award of this additional, relatively small, amount necessary to adequately compensate Normark for its defense of the Kelley Claim and pursuit of its related motions for fees. To the extent any expenses might otherwise be justified, they are adequately offset by the court's award of 30% in attorney fees for pursuit of the fee motions. Given this award of fees, the court does not find it would be "grossly unjust" for Normark to bear these expenses in light of the fee award allowed above. *See Highmark*, 687 F.3d at 1310 n.1.

**Expert Fees.** The court declines to award any part of the $24,371 in expert fees Normark incurred in defending the Kelley Claim. Most of Normark's expert fees were necessarily incurred before November 3, 2011, given that Normark filed Professor Siegel's expert report and a related

---

[29] While Pure Fishing challenges the propriety of awarding any fees, it does not challenge the rates sought, hours invested, or other factors relevant to the amount of the fees to be awarded.

affidavit in support of its claim construction in August 2011. Dkt. No. 73-15, 73-16.[30] Thus, most were incurred during a period for which the court has found no subjective bad faith.[31] The court further finds the award of fees above sufficient to adequately compensate Normark for its defense of the Kelley Claim for the period that claim was pursued in subjective bad faith. *See MarcTec*, 664 F.3d at 921-22 (noting court has inherent power to award expert fees where "vexatious conduct and bad faith increased the cost of litigation in ways that are not compensated under § 285" but should "explain why an award of attorney fees under § 285 is insufficient").

### B.    Cook Claims

#### 1.    Background

**Claim Construction.**    Litigation as to the Cook Claims included some dispute as to claim construction, which the court was able to resolve by written order without oral argument. Dkt. No. 83 (claim construction order entered October 26, 2011). The most critical issue was the extent to which use of the term "about" modified two phrases, one setting a temperature range and one setting a draw ratio. The court rejected both parties' proffered interpretations of "about" as it related to the temperature range. *See* Dkt. No. 83 at 4-6 (finding neither party's construction persuasive and evidence insufficient to clarify the meaning of "about" beyond "approximately"). The court adopted

---

[30]    The fees sought are for Professor Siegel's expert work and report, for testing by Jordi Laboratory, and for services provided by Dr. Germani. Normark asserts that Professor Siegel relied on the other two sources in forming his opinions. It follows that the services provided by the other two sources predated Professor Siegel's submission of his written opinion.

[31]    Professor Siegel was apparently deposed on November 3, 2011. While this is just within the period for which the court has found subjective bad faith and awarded attorney fees under Section 285, the court does not find sufficient justification for exercise of its inherent power to award expert witness fees for deposition attendance on this date.

Pure Fishing's interpretation of "about" as it related to the draw ratios. *Id.* at 6-7.  Neither party sought reconsideration of this order.

**Discovery and Amendment of Complaint.**  The matter proceeded through discovery, with judicial intervention being required only as to a few discovery disputes and a motion to amend the complaint.  The motion to amend the complaint was granted to the extent it sought to add a claim for willful infringement but denied to the extent it sought to add a claim under the doctrine of equivalents.  Dkt. Nos. 155 (June 8, 2013 motion to amend), 195 (July 26, 2012 order granting in part).  Pure Fishing sought reconsideration of the partial denial of its motion.  Dkt. No. 208.  That motion was also denied.  Dkt. No. 262 (order entered September 12, 2012).

A motion to compel discovery (also filed by Pure Fishing) was, similarly, granted in part and denied in part.  Dkt. Nos. 179 (motion to compel), 224 (August 15, 2013 order granting in part).  Other discovery disputes were resolved by teleconference without formal motion.

**Cross-Motions for Summary Judgment.**  On August 6, 2012, the parties filed cross-motions for summary judgment and other related motions.  Dkt. Nos. 201-07.[32]  Critical for purposes of this order, Pure Fishing sought summary judgment on its claim of literal infringement and on Normark's affirmative defenses and counterclaim.  Normark, in turn, sought summary judgment on its affirmative defense of invalidity and on the claim of willful infringement.  Normark's motion was dependent, in large measure, on the deposition of the claimed inventor, Roger Cook ("Cook") who was deposed on April 11, 2012. *See, e.g.*, Dkt. No. 201-29.

**Stipulation of Infringement.**  On August 8, 2012, two days after filing their cross-motions for summary judgment, the parties filed a stipulation regarding infringement issues.  Dkt. No. 217.

---

[32]  The record contains both redacted and unredacted versions of many of these documents.

Specifically, the parties stipulated that, for a specified period (June 2008 through June 9, 2010), certain of Normark's fishing lines were made using a process which literally infringed the Cook Patent.  *Id.* ¶¶ 6-8.  The parties further stipulated that the processes used for the two previously infringing product lines were changed on May 31, 2010 and June 9, 2010, so that products made after those dates did not literally infringe the Cook Patent.  *Id* ¶¶ 9-10.

Allowing for the sales cycle, the parties stipulated that Normark's accused products sold before November 30, 2010 literally infringed the Cook Patent but those sold after that date did not. *Id.* ¶ 11.  They further stipulated that, unless the doctrine of equivalents was allowed on reconsideration of the motion to amend, Normark's products sold after November 30, 2010 did not infringe the Cook Patent.  *Id.* ¶ 12.

Normark reserved its right to challenge Pure Fishing's claims of infringement on other grounds.  *Id.* ¶ 14.  Pure Fishing reserved its right to pursue its motion to reconsider denial of its motion to amend to the extent it sought to add a claim under the doctrine of equivalents and a related right to appeal.  *Id.* ¶ 13.[33]

Roughly two weeks later, on August 21, 2012, the parties filed a second stipulation addressing the effect of the earlier stipulation on their cross-motions for summary judgment.  Dkt. No. 226.  Specifically, they agreed that the prior stipulation resolved portions of both parties' cross-motions for summary judgment (Pure Fishing's pursuit of partial summary judgment that Normark had literally infringed the Cook Patent, and Normark's corresponding motion for summary judgment that it had not).  *Id.*

---

[33]  As noted above, the motion to reconsider was, ultimately, denied.

41

**Summary Judgment Ruling.**  The court issued an oral ruling on the cross-motions for summary judgment on October 5, 2012, directing Normark to prepare a proposed order and addressing procedures for comment on the proposed order.  Dkt. No. 273.  The court entered its written order on December 11, 2012.  Dkt. No. 278.  Critical for purposes of this order were the following findings:

> The court finds that claims 1, 4, and 5 of the '214 patent are invalid as a matter of law for three reasons. First, the asserted claims are invalid under 35 U.S.C. § 102(f), because Roger Cook is not the inventor of the asserted claims.  Second, the asserted claims are invalid under 35 U.S.C. § 102(b), because [Pure Fishing] used the claimed process to make the 1995 Fireline Fused products more than one year before it filed the application that led to the '214 patent.  Third, the asserted claims are also invalid as obvious under 35 U.S.C. § 103.

Dkt. No. 278 at 3; *id.* at 26-31 (addressing invalidity for lack of inventorship); *id.* at 31-36 (addressing invalidity due to prior sales of 1995 Fireline Fused products).

These rulings resulted in dismissal of all claims asserted by Pure Fishing despite the earlier stipulation that Normark had literally infringed for a specified period of time.  Only Normark's counterclaim for inequitable conduct proceeded to trial.

**Inequitable Conduct Counterclaim.**  Trial on the inequitable conduct counterclaim was scheduled for April 15-16, 2013.  Dkt. Nos. 306, 307.  During the first day of trial, the court reviewed certain documents *in camera*, and ordered that some of them be produced.  Due to this late production, trial was continued to May 14-15, 2013.  Dkt. Nos. 307, 322, 323.  Both parties submitted post-trial proposed findings and conclusions and related responses in July 2013. Dkt. Nos. 332, 333, 335, 336.

The court issued its findings and conclusions on August 14, 2013.  Although the court found various material misrepresentations or omissions were made to the PTO, it did not find clear and

42

convincing evidence of intent to deceive. The court, therefore, found for Pure Fishing on Normark's

counterclaim for inequitable conduct. Dkt. No. 338.

### 2.    Objective Prong

Normark argues that Pure Fishing's pursuit of the Cook Claims was objectively unreasonable

for two reasons. First, Normark argues that Pure Fishing "never had any legitimate basis for this

claim" because the sole claimed inventor, Roger Cook, testified in his deposition that the "claimed

invention was 'not his idea,' but instead was based on recommendations made by [Pure Fishing's]

supplier," and this testimony was confirmed by Pure Fishing's own documents. Dkt. No. 364 at 1.

Second, Normark argues that overlaps between the process claimed in the Cook Patent and the

Fireline Fused products, which were on sale more than a year before Cook filed the application that

matured into the Cook Patent, precluded any reasonable argument that the on-sale bar did not apply.

Both arguments are founded on Normark's success on its invalidity defense.

While the court ultimately ruled in Normark's favor on this invalidity defense, finding the

Cook Patent invalid on both grounds, it does not find Pure Fishing's opposition to Normark's

position as to either ground for invalidating the patent to be "such that no reasonable litigant could

reasonably expect success on the merits." *Highmark*, 687 F.3d at 1309. It is of some significance

here that the critical arguments related to an affirmative defense, and not to the underlying claims

of infringement on which Pure Fishing was at least partially successful as a result of the stipulation

of infringement. Moreover, this affirmative defense required proof by clear and convincing

evidence. *E.g.*, *Price v. Symsek*, 988 F.2d 1187, 1194 (Fed. Cir. 1993).

**On-Sale Bar.** Evaluation of the on-sale bar defense required both interpretation of the scope

of the Cook Patent and a determination of the extent, if any, of its overlap with the process used to

make Fireline Fused products during the relevant period.  While the court ultimately rejected Pure

Fishing's arguments regarding the overlap, it does not find them so unreasonable as to satisfy the

standard for objective unreasonableness.

For example, Pure Fishing's argument that the Cook Patent did not overlap with Fireline

Fused was based, in part, on intrinsic evidence relating to the resulting line's opaque white color,

which it argued a person skilled in the art would realize meant no fusing had occurred.  *See* Dkt. No.

244 at 24 (memorandum in opposition to summary judgment).  Pure Fishing also relied on intrinsic

evidence referring to a "total" draw ratio, which it argued distinguished the Cook Patent from the

Fireline Fused's multistage drawing. *Id.* at 20-23.  *See also* Dkt. No. 338 at 2 n.2 (Findings and

Conclusions on Inequitable Conduct noting invalidity determination turned, in part, on the

overbreadth of the claims).   These arguments in reliance on intrinsic evidence, while ultimately

unsuccessful, were not so unreasonable that no reasonable litigant could reasonably expect them to

succeed on the merits in light of Normark's burden of proving invalidity by clear and convincing

evidence.

**Inventorship**.  While a closer question, the court reaches the same conclusion as to Cook's

claim of inventorship.  Certainly, in light of Cook's statements in his deposition, Pure Fishing had

an uphill battle to overcome the invalidity defense based on lack of inventorship.[34]  However, given

the applicable standard of proof, Pure Fishing's argument that the input and assistance received

from third-parties did not defeat Cook's claim of inventorship was not so unreasonable as to be one

---

[34]  Certain evidence from the files of the attorney who prosecuted the application for the Cook
Patent was not obtained by Pure Fishing until shortly before or during the inequitable conduct trial.
Some of this evidence provided additional support for findings that Cook was not the inventor of the
full scope of what was claimed in the Cook Patent.  *E.g.*, Dkt. No. 338 at 23 n.12, ¶¶ 44, 45; *id*. at
26-28 ¶¶ 50, 53, 54.

on which no reasonable litigant could expect to succeed. *See* Dkt. No. 244 at 17-18. Pure Fishing's

arguments based on Cook's possibly flawed recollection (nearly twenty years after the patent issued)

and limited understanding of patent law, as well as Foote's possibly contradictory testimony were,

likewise, not so unreasonable that they satisfied this standard. *Id.* at 18-19. Therefore, given the

applicable standard of proof, the court does not find Pure Fishing's opposition to this aspect of

Normark's invalidity defense to have been objectively baseless in light of the full record.

In sum, considering the full record as developed through the conclusion of this matter in

light of the standard of proof applicable to the invalidity defense, the court finds that Normark has

failed to show, by clear and convincing evidence, that Pure Fishing's pursuit of the Cook Claims

was objectively baseless.[35]

## 2.     Subjective Prong

Because the court finds the objective prong is not satisfied, it need not address the subjective

prong. Were the court to reach the subjective prong, it would find it not satisfied for many of the

same reasons addressed above as to the objective prong. The primary difference is that the court

would consider the state of the record *at the time the court granted summary judgment*. This would

preclude consideration of evidence that was not available to Pure Fishing's counsel until after the

summary judgment order was entered.[36] Thus, even if this court found Pure Fishing's arguments

in opposition to Normark's invalidity defense to be objectively baseless, it would not find them so

---

[35] The court also finds, in the alternative, that Normark failed to meet this burden under a preponderance of the evidence standard. While this finding presumes an alternative burden of proof as to the motion for fees, it recognizes that Normark's ultimate success (after stipulating to a period of infringement) required it to establish invalidity by clear and convincing evidence.

[36] The court does not consider here documents that were not available to Pure Fishing or its counsel prior to summary judgment. *See supra* n.34.

clearly baseless as to support a finding of subjective bad faith, particularly in light of the requirement that such a defense be proven by clear and convincing evidence.

**III.     RULE 11**

For the same reasons addressed above with respect to the objective prong of the frivolousness determination, the court does not find Rule 11 sanctions warranted as to the Cook Claims. That is, the court does not find that "a reasonable attorney in like circumstances could not have believed his [arguments in opposition to the invalidity defense] to be legally justified." *Morris*, 448 F.3d at 277.

**CONCLUSION**

For the reasons set forth above, the court grants in part and denies in part Normark's motion for an award of attorney fees under Section 285 as to the Kelley Claim (Dkt. No. 352), awarding a total of $77,562.75. The court denies the motions for sanctions under Rule 11 and for attorney fees under Section 285 as to the Cook Claims. Dkt. Nos. 351, 353.[37]

IT IS SO ORDERED.

s/ Cameron McGowan Currie
CAMERON MCGOWAN CURRIE
Senior United States District Judge

Columbia, South Carolina
January 21, 2014

---

[37] As noted above, the parties have resolved their cross-petitions for costs under Fed. R. Civ. P. 54 by stipulation.